Filed 10/14/08          NO. 4-07-1068

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE UPPER SALT FORK DRAINAGE DISTRICT, in the County of Champaign, State of Illinois, Plaintiff-Appellant, v. FRANK DiNOVO, VICTORIA A. ROWE, DAVID PAUL, BRUCE MAST, and DARRELL J. HURT, Objectors-Appellees. | ) ) ) ) ) ) ) ) ) ) ) | Appeal from Circuit Court of Champaign County No. 97MC30 Honorable Holly F. Clemons, Judge Presiding. |

_____

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, the Upper Salt Fork Drainage District, petitioned the trial court for an increase in its annual maintenance assessment. Some landowners objected. In a bench trial, the trial court found that the District had proved its need for an increase, but because the District did not provide enough information about the structures it intended to build in the ditch, the court authorized a lesser amount of increase than the District had requested. The District appeals. We do not find the judgment to be against the manifest weight of the evidence. Engineers testified that some of the structures the District proposed could cause erosion and flooding. A reasonable trier of fact could require more information about the number, dimensions, and locations of these structures--which would cost thousands of dollars apiece--rather than decide, sight unseen, that they were a good investment. Therefore, we affirm the trial court's judgment.

## I. BACKGROUND

On September 4, 2007, the Upper Salt Fork Drainage District filed a petition seeking authority to do two things: (1) increase the annual maintenance assessment in the main district (count I) and (2) establish an annual maintenance assessment in subdistrict No. 2 (count II). See 70 ILCS 605/4-19 (West 2006). Only count I--the request to increase the annual maintenance assessment in the main district--is at issue in this appeal.

According to count I, the district's drain consists of a single ditch approximately 21 miles long, extending from Rantoul to about 3 miles south of St. Joseph, where it empties into the Salt Fork River. At the upper end of the District, the ditch is 15 feet deep with a bottom 120 feet wide, 1 1/2-to-1 slopes (1 1/2 feet back to 1 foot of rise), and a bottom grade of 0.17% (9 feet of fall per mile of ditch). At the lower end of the District, the bottom of the ditch is 80 feet wide with a slope of only .035% (2 feet of fall per mile of ditch). The banks of the ditch are eroding into the channel, and as the slope of the bottom flattens and the channel becomes wider, the water slows down and drops its load of sediment. Recently, on May 13, 2004, the circuit court approved an additional assessment of $335,000 (see 70 ILCS 605/4-19 (West 2006)), which the District used to dredge sediment from the ditch bottom.

The District would like to get erosion under control, reducing the amount of sediment that enters the ditch and making it less costly to remove the sediment in the future. To that end, the District has consulted Wayne Kinney of Midwest Streams, Inc., a company that specializes in stabilizing the banks of waterways. According to the petition, Kinney has submitted "a proposal to prepare a [l]ong[-][t]erm [m]aintenance

[p]lan." A copy of Kinney's proposal (but not the plan, which is yet to be prepared) is attached to the petition as exhibit A.

In his proposal, Kinney recommends, first of all, stabilizing the banks of the ditch, mostly by installing stone toes. The banks of the ditch are especially vulnerable to erosion wherever the stream meanders into them. The flowing water scours the toe of the slope, undercutting the bank and causing it to collapse. A stone toe is a structure at least three feet wide composed of large quarry stones, or rip-rap. This rip-rap is built up in the toe of the slope to about two feet above the base-flow elevation, to prevent the current from scouring away the bank.

In some places, Kinney states in his proposal, the channel has become too wide. As the water spreads out, it grows shallow, and the energy of the current is dissipated, reducing its capacity to carry sediment. Kinney proposes solving this problem through two techniques. One technique is to narrow the channel with J-hook vanes and bendway weirs. A J-hook vane is rip-rap assembled roughly in the shape of a J. The top bar of the J is anchored in a bank of the ditch, and the rest of the J is in the water, extending upstream and curving toward the center of the channel. There are gaps in the hook of the J, to allow water to flow through. Inside the hook, the current swirls around in a scour pool, deepening the channel and creating a habitat for aquatic life. A bendway weir is a similar structure. It is anchored into an eroding bank and diverts the current away from the bank, creating a habitat for fish and narrowing the channel so as to make it flow faster and carry more sediment. These structures form a two-stage channel, turning the ditch into a sort of microcosmic river valley consisting of a deeper,

inset channel, which carries the water most of the time, and a wider, miniature floodplain, which is 5 or 10 feet below the original floodplain.

Kinney's second technique for remedying an over-widened channel is to build a rock-riffle sequence. Lines of rip-rap, called rock riffles, are placed all the way across the stream, and these riffles are spaced out so as to leave room for pools to form in between them. These pools will be habitat for fish and also will help to keep the water clean. Water will accumulate in the pools and spill over the riffles with enough velocity to carry away the sediment.

Where the channel is narrow but meandering into a bank, causing the bank to be steep and unstable, Kinney proposes installing rock-riffle grade controls, which will "direct flow to the center of the channel, create deeper pools[,] and reduce velocities in the newly formed pools. The stream energy that is eroding the banks will *** be dissipated in the deep pools and on the steep stone backslopes designed to withstand the increased velocity[,] protecting the banks from erosion and reducing the channel[']s[] natural tendency to meander."

These strategies, the proposal says, are "intended to be long term and will likely take a span of many years to fully implement." The plan will "require monitoring as implementation begins[,] to refine the design techniques [so as] to insure the most effective use of resources." Kinney notes that bendway weirs and J-hook vanes are "not known to have been used in small streams, [but] the[se] concept[s] [are] widely used by the [United States] Army Corps of Engineers on navigable streams to maintain a navigable channel. The plan will explore [their] application in [the Upper] Salt Fork Drainage District."

Under the heading of "Plan Development," Kinney concludes as follows:

"The proposed plan will be developed using the experience of Midwest Streams, Inc.[,] along with existing data on stream flows and existing profiles and geomorphic studies.  The approach will be to use accepted hydraulic flow equations to determine the impact of all planned improvements to insure that adequate channel capacity is maintained.  This approach will require each site to be evaluated and designed as maintenance works are proposed for implementation.  The impact of each project will not be determined in the [l]ong[-][r]ange [m]aintenance [p]lan.  However, this site[-]specific approach will avoid the use of extensive data[-]collection necessary to complete a hydraulic model study such as HEC-RAS [(Hydrologic Engineering Center River Analysis System)].  Rather[,] it will rely on site[-]specific data and analysis at each location at the planned time of design and implementation to satisfy all [f]ederal, [s]tate[,] and [l]ocal permit requirements.  Midwest Streams, Inc.[,] will be available to do the design and analysis at each site as implementation proceeds.  Plans 'sealed' by a registered professional can be provided.  Upper Salt [Fork] Creek Drainage District will[,] however[,] be required to agree to the attached 'Disclaimer' since Midwest

Streams, Inc.[,] is not a licensed engineering firm."

The proposed disclaimer states that "[i]n completing this report, Midwest Streams, Inc.[,] has neither hired nor consulted with an engineer of any kind" and that "[n]either the author of this report nor Midwest Streams, Inc.[,] shall be responsible for compliance with any engineering standards whatsoever in the creation of this report." ("Report," in this context, apparently means the yet-to-be-completed long-term maintenance plan.) Further, the user of the report agrees to "assume full responsibility for all construction design, construction management[,] and/or engineering of any kind employed in implementing any information contained in this report" and to "indemnify, defend, and hold harmless Midwest Streams, Inc., [and] its *** employees and agents[] from and against any *** causes of action and claims whatsoever, brought by any governmental body or any third person, relating to or arising out of the use of this report."

The District evidently was prepared to execute the disclaimer, for it wanted to hire Kinney and install the structures he recommended. But, as Kinney stated in his proposal, before his general ideas actually could be "implemented," he had to study the ditch further and prepare a long-term maintenance plan. He estimated it would take him 320 hours to do so. At $75 an hour, that would be $27,000.

The District did not have $27,000. It described its financial situation as follows:

"The District was authorized by [the circuit] court in 1965 to levy an annual maintenance assessment within the District in the total amount of $15,000.00. At that time, the

- 6 -

District contained just over 13,000 acres. The average assessment per acre was $1.15. The annual maintenance assessment of $15,000.00 that was approved over 40 years ago is no longer adequate to meet the maintenance needs of the District today and certainly not sufficient to pay for either the preparation or the implementation of the [l]ong[-] [t]erm [m]aintenance [p]lan proposed by Midwest Streams, Inc."

The District had been levying 100% of the allowable annual maintenance assessment for many years. At the end of fiscal year 2006, the District had only $2,862.80 on hand, and it had incurred legal fees and other expenses in excess of $15,000. The District alleged it did not take in enough revenue to maintain the ditch and pay its professionals. It proposed increasing the maximum rate of the annual maintenance assessment from approximately $1.15 per acre to $5 per acre and $20 per residence and commercial property--a total assessment of $87,453.44 per year.

In the following paragraph of its petition, the District gave an idea of how the $87,453.44 would be spent:

"The cost of the preparation of the [l]ong[-][t]erm [m]aintenance [p]lan by Midwest Streams, Inc.[,] will be $27,000.00. The cost of constructing [s]tone[-][t]oe [p]rotection is $20 to $40 per lineal foot of bank treated. The District has determined that there are at least 5,000 lineal feet of ditch bank upstream from CR 1850 N [(County

- 7 -

Road 1850 North)] that are in need of erosion control. At an average of $30 per lineal foot, the cost would be $150,000. The construction of [b]endway [w]eirs and/or J-[h]ook [v]anes downstream from CR 1850 N is estimated to cost approximately $2,000 per structure. The cost of [r]ock [r]iffles downstream from CR 1850 N is estimated to [be] $50 per lineal foot. Where the ditch bottom is 80 feet wide, the cost of a [r]ock [r]iffle would be $4,000. Rock [r]iffles upstream from CR 1850 N will cost approximately $25 per lineal foot or $500 for a 20[-]foot[-]wide bottom. The cost of removing debris at the trestle is approximately $4,000.00 every four years. The cost of selective tree[-]removal and sediment removal is on a per[-]unit basis and can[]not be estimated at this time. Unlike an additional assessment, the cost of annual maintenance is not finite. The type of work and the extent of the work are not static from year to year."

The District published a notice in a local newspaper, stating the amount of the proposed increase in the annual maintenance assessment and announcing that the petition for this increase would be heard on October 3, 2007. The District also mailed the notice to the more than 600 landowners in the District. Before October 3, 2007, only one person filed an objection: Frank DiNovo.

In the hearing on October 3, 2007, the District moved to admit the petition in evidence, and the trial court granted the motion. The petition included the annual

maintenance assessment rolls; Kinney's proposal; the annual financial report as of the end of the fiscal year, September 30, 2006; and the current financial report from September 30, 2006, to August 8, 2007.

After October 3, 2007, over the District's objection, the trial court allowed five more persons to file objections to the petition. The ground of the District's objection was that under section 4-23 of the Illinois Drainage Code (70 ILCS 605/4-23 (West 2006)), all objections had to be filed "at or prior to the time fixed for hearing," which was October 3, 2007.

When the hearing resumed on November 13, 2007, the District rested, asserting that the petition the trial court admitted in evidence on October 3, 2007, made a prima facie case as to count I. See 70 ILCS 605/4-34 (West 2006). (The court previously entered judgment on count II.) An attorney representing all six objectors then called his witnesses.

The objectors called Clark Bullard as their first witness. He testified he had a Ph.D. in fluid mechanics and that since 1980, he had been a professor of mechanical engineering at the University of Illinois. Over the past four years, he had spent a minimum of five hours a week on the Salt Fork River, observing how the channel was reacting to previous dredging and how high the benches of sediment were growing at the bottom of the channel, looking at bank failures, and trying to understand how they had happened--whether by undercutting of the bank or by the soil becoming top-heavy from saturation. Bullard agreed with the two-channel concept, but he was unable to say whether Kinney's proposal was sound from an engineering point of view, for the proposal did not contain enough information on which to form an opinion. He would

have to review the long-term maintenance plan, in which Kinney supposedly was going to be more specific about where the various structures would be installed. All Kinney had provided, thus far, was "a proposal to do a study."

According to Bullard, it mattered a lot where one put a J-hook vane or bendway weir, and he simply did not know where Kinney intended to put them. He testified: "If a J-hook vane is put in at the wrong angle, it could deflect the flow at some level. *** [I]t could work fine at a low-level water flow, but at a higher[-]level water flow[,] it might deflect the flow across the stream and erode the bank on the opposite side." If Bullard knew the precise locations and dimensions of the structures, he could enter this information into HEC-RAS, a software program that automatically would use physical equations to predict the combined effect of these structures (the "velocity patterns") along the entire length of the ditch.

As Bullard explained, HEC-RAS would not tell an engineer everything he or she needed to know. After obtaining the velocity patterns from HEC-RAS, the engineer then would have to perform other calculations to see what the velocity might mean for erosion, given the different types of soil in the banks. But, in Bullard's view, HEC-RAS was an invaluable tool for making an informed decision about what structures to use, what their dimensions should be, and where to put them, and not using it would be a waste. Counsel asked him:

"Q. Is a HEC[-]RAS analysis expensive?

A. No, it's fairly quick and easy. The expensive part, we're fortunate, in that the Salt Fork has already been done. The expensive part was probably hundreds of thousands of

dollars[,] if not more, worth of data collection[] and loading all that data on a hundred miles of channels in the Salt Fork Basin upstream of this location and downstream. All the channel cross-sections, the slope in each area, that was all done with taxpayer money by the [United States] Department of Agriculture, and then it is now available for use in the Salt Fork River Valley."

Bullard added that HEC-RAS was usable despite the dredging in 2005 and 2006 because HEC-RAS had "the before and after geometries in it, before and after the last dredging."

Counsel asked Bullard:

"Q. *** [W]hat else additional would need to be done to do a complete HEC[-]RAS analysis here?

A. The specific locations, sizes, shapes, of all the structures that would be put in and all of the bank[-]reshaping that would be done in areas where the bank is eroding; accounting for the roughness of any stone[-]toe protection; and in the case of bendway weirs or J-hook vanes, the height, the width, the length, and then the model would test the performance of those structures at all different water levels for a [1]-year flood, a [10]-year flood, a 50-year rainfall coming into the watershed; and determine the sediment-carrying capacity of the river before and after the structures, or the reshaping of the banks is done so that

- 11 -

you would know the sediment-carrying capacity. You would

know the water level for its effect on drainage. You would

know the velocity of the water in various places where you

may be concerned about causing future bank failures."

Because one structure might determine the location of another, it was best, in Bullard's

opinion, "to know where you plan[ned] to put all of these structures before you start[ed]

building them."

The objectors also called a consulting civil engineer, John Frauenhoffer of

Frauenhoffer and Associates, P.C., an engineering firm that had been in existence for 28

years. Like Bullard, Frauenhoffer did not find enough information in the proposal to

determine whether the project would have any adverse flooding effects. But

Frauenhoffer was concerned about the placement of structures--any structures--within

the channel itself. He believed it was "dangerous" and a "very poor choice" to put rip-

rap in the bed of such a shallow stream. He believed the risk was too high that people

would dislodge the rip-rap or that floods would "fluidize" it. And, besides, any rip-rap at

all inevitably would reduce the hydraulic capacity of the ditch--wherever in the channel

one put it. He testified: "You cannot take [a] cross-sectional area out of the channel and

expect the channel to perform at the same hydraulic level."

In Frauenhoffer's opinion, "erosion need[ed] to be treated at the location

where it occur[red] ***. *** [T]hose erosions protections need[ed] to occur within the

bank, either in the form of laying the bank back, if that[] [were] possible and agreeable

to the land[]owner, or in the form of construction of a permanent structure [on the

bank] that would not be fluidized by the flood flows themselves," such as a gabion

- 12 -

basket, steel sheet piling, or a poured concrete bank. (He gave no estimate of the cost of such structures.) If a project entailed building several structures, they all would have to work together as a system; therefore, before starting to build, one ought to be clear where each structure shall be located.

The objectors themselves also testified. Generally, their main objection was the District had no plan, only a proposal to make a plan. Without a plan, the objectors did not know specifically how the $87,453 per year would be spent. Also, some of the objectors were worried that the District would cut down an excessive number of trees on its right-of-way, causing their property to lose value.

After hearing this testimony and arguments by counsel, the trial court reserved its ruling on whether the objectors had rebutted the District's <u>prima</u> <u>facie</u> case. The court told the District to present its evidence as if the objectors had rebutted the <u>prima</u> <u>facie</u> case.

The District called Kinney. He testified he was a private consultant operating under the name of Midwest Streams, Inc. He had a degree in forestry, and for 31 years, he worked for the Natural Resources Conservation Service, a division of the United States Department of Agriculture. From 1996 until his retirement in 2003, he was the stream-bank specialist in Illinois for the Natural Resources Conservation Service.

In his career, Kinney had not done any computer modeling. He did not believe it was necessary in this case. The applicable hydraulic formulas could be used without computer modeling. His approach was, as he testified, "more site-specific for each individual structure that[] [was] planned."

According to Kinney, the structures he proposed installing would not make a substantial change in the hydraulics of the ditch, but they would make a dramatic difference in the stability of its banks. The rip-rap he would place within the channel would have a "very minimal impact" and "would fall within the parameters of the nation[]wide permit that[] [had] been approved and reviewed by the Corps of Engineers *** and all the permitting agencies."

Kinney believed in stabilizing the toe of the slope and the bed of the channel and then letting the upper banks stabilize naturally. "Most erosion," he testified, "is driven by the bottom of the channel toward the top." Once the toe of a vertical bank was stabilized, the bank would not continue to stand vertically but would find its natural angle of repose, and then it could be seeded. Kinney advocated "do[ing] the minimal amount of impact that you [could] in a channel, leaving the vegetation in place and allow[ing] the bank to stabilize naturally where *** possible."

The structures he proposed were good for fish and for the aquatic organisms on which fish depended. Rock riffles caused turbulence, increasing the dissolved oxygen in the water. The pools in between rock riffles increased the depth and coolness of the water. By stabilizing outside bends, Kinney would reduce the sediment going into the channel and make the water cleaner.

On cross-examination, Kinney admitted that without further study, he could not point out, on a map, where any of the structures would be located. He agreed the commissioners would "be in a better position to decide what structures to use after they read [his] plan than now." He admitted that, to his knowledge, bendway weirs and

J-hook vanes had never been used in a small stream such as the one in question, at least in Illinois.

On redirect examination, Kinney testified the Corps of Engineers used bendway weirs and stream barbs "for navigational purposes, in order to keep the navigational channel the required nine feet deep." Kinney had conferred with engineers at the waterway hydraulic experiment station of the Corps of Engineers in Vicksburg, Mississippi, and they had assured him "there was absolutely no reason why [such structures] would not work in a stream the size of the Salt Fork."

On November 26, 2007, the trial court ruled from the bench. The court was "persuaded that a long-term maintenance plan [was] critical to the well-being of the drainage district. As established by the evidence, there[] [were] significant concerns with respect to stream[-]banks stabilization, erosion, flow of the stream[,] and other items." It had been 42 years since the annual maintenance assessment of $15,000 had been increased, and the court had no doubt that in filing the petition, the commissioners were acting in good faith and in the best interest of the District. The court, however, shared the objectors' concern that the proposal lacked specificity and was "speculative." Bullard and Frauenhoffer had raised valid questions. The court believed it had "insufficient detail at this time *** to determine whether the full amount of the request [was] necessary and advisable," and "without a more definite and certain plan," the court was unwilling to "grant the District carte blanche." The estimated construction costs for maintenance were, at this point, "purely conjectures," because the District did not yet have a "final plan [as to] what areas [would] actually need work and what exactly [would] be done in those particular areas." The court decided that "the $27,000.00

- 15 -

required for the [preparation of] the long-term plan [was] both appropriate and advisable," as the benefits outweighed the costs of preparing that plan. Mindful of the ongoing need for short-term maintenance, the court "authorize[d] a total annual maintenance assessment not to exceed $55,000.00." The court directed the District's attorney to prepare an order.

That same day, November 26, 2007, the trial court entered the following docket order: "As to [count] I, [the] court enters a judgment in favor of Upper Salt Fork Drainage District. [The] District is authorized to increase its annual maintenance assessment to $55,000[] for one year. After the year, the [D]istrict may assess a maximum o[f] $28,000 annually without [c]ourt [o]rder. *** Order to be entered." On November 30, 2007, the court executed and entered an order to that effect.

This appeal followed.

II. ANALYSIS

A. The Necessity of "Plans, Profiles, or Specifications"

To increase an annual maintenance assessment, the commissioners of a drainage district must petition the circuit court to do so, and section 4-19 of the Illinois Drainage Code says "[t]he petition shall contain the following (or so much thereof as may be applicable)." 70 ILCS 605/4-19 (West 2006). The statute then lists 11 items, including "such plans, profiles[,] or specifications as may be necessary." 70 ILCS 605/4-19(d) (West 2006). For two reasons, the District argues it did not have to submit plans, profiles, or specifications with its petition to increase the annual maintenance assessment: (1) the petition "[did] not seek approval of a particular project," and (2) according to section 4-15 (70 ILCS 605/4-15 (West 2006)), "the court ha[d] no authority

- 16 -

over how the District perform[ed] maintenance work."

As for the first reason, the District argues that while plans, profiles, and specifications can be "applicable" and "necessary" to a one-time "project" contemplated by an additional assessment, they are never "applicable" and "necessary" to ongoing "maintenance" contemplated by an annual maintenance assessment. See 70 ILCS 605/5-1 (West 2006) (defining these two types of assessment). This argument does not have much textual support in section 4-19. The legislature easily could have said, categorically, that plans, profiles, and specifications never were required for annual maintenance assessments, but the legislature did not do so. Instead, the legislature used flexible phraseology: "as may be applicable" and "as may be necessary." 70 ILCS 605/4-19 (West 2006).

Perhaps the legislature wanted to be flexible because the difference between a "project" and "maintenance" can be elusive, especially if a drainage district does "projects" to "maintain" a drain. According to the petition, each J-hook vane and bendway weir will cost $2,000, and where the bottom of the ditch is 80 feet wide, a rock riffle will cost $4,000. (It is unclear what a sequence of rock riffles will cost.) These structures aspire to the dignity of "projects." Assembling an in-channel wall of several tons of quarry stones at a cost of thousands of dollars seems qualitatively different from pulling a fallen tree out of the ditch or seeding a bank.

It is unclear why such permanent and expensive structures would not qualify as "improvements" of the ditch or (given Bullard's and Frauenhoffer's testimony) "substantial or material alterations" of the ditch, both of which require judicial authorization. See 70 ILCS 605/4-15, 4-16 (West 2006). The supreme court has defined

an "improvement" as "'[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty[,] or utility or to adapt it for new or further purposes.'" St. Louis v. Rockwell Graphic Systems, Inc., 153 Ill. 2d 1, 4, 605 N.E.2d 555, 556 (1992), quoting Black's Law Dictionary 682 (5th ed. 1979). That definition appears to describe the proposed J-hook vanes, bendway weirs, and rock-riffle sequences. According to Kinney and the District, these will be more or less "permanent" structures--"integral component[s] of the overall [drainage] system"--and they will "enhance" the "value" and "use" of the ditch. See St. Louis, 153 Ill. 2d at 4-5, 605 N.E.2d at 556.

Without plans, profiles, or specifications showing the locations and dimensions of these improvements, the trial court could have deemed itself unable to make the findings that section 4-24 required. See 70 ILCS 605/4-24 (West 2006). In a hearing on a petition, a court will ask two questions: (1) whether "it is necessary or advisable to do one or more of the things proposed" and (2) whether "the benefit resulting therefrom to the lands in the district exceed[s] the cost to such lands." 70 ILCS 605/4-24 (West 2006). If the court answers no to either of those questions, it will dismiss the petition. 70 ILCS 605/4-24 (West 2006). If the court answers yes to the questions, it will make findings that specify the following:

> "(a) the things which should be done, (b) the method by
> which the things shall be done, (c) the probable cost thereof,
> (d) whether an assessment shall be levied or increased, (e)
> the amount of any assessment or additional assessment or

new or increased annual maintenance assessment to be levied, and (f) any other matters which the court deems pertinent."  70 ILCS 605/4-24 (West 2006).

To argue, as the District does, that "the method by which the things shall be done" is inapplicable to increasing an annual maintenance assessment is simply untenable, for in the immediate context of that phrase--in the same list of findings--the statute twice mentions such an increase.  If the court in this case believed Bullard's and Frauenhoffer's testimony, as it was entitled to do, it could refuse to find that J-hook vanes, bendway weirs, and rock-riffle sequences were sound "methods" or that they "should be done" or that the benefits of these structures exceeded the costs.  At least, the court reasonably could have required more information, i.e., where, in the 21-mile ditch, these structures were to be installed and what were the dimensions of these structures.  Then the objectors could subject this information to critique by engineers such as Bullard and Frauenhoffer.

The second reason the District gives for the inapplicability of plans, profiles, and specifications is the District's "carte blanche authority over how to perform repair and maintenance work."  According to the District, section 4-15 (70 ILCS 605/4-15 (West 2006)) denies the trial court any "oversight of how the District and its commissioners perform repair and maintenance of the ditch."  Section 4-15 does indeed say the commissioners may repair and maintain the drains "without prior authorization of the court."  70 ILCS 605/4-15 (West 2006).  But section 4-15 presupposes that the commissioners already have the funds to do so:  "The commissioners may, without prior authorization of the court, use corporate funds of the district for the repair,

- 19 -

maintenance, operation[,] or improvement of drains." (Emphasis added.) 70 ILCS 605/4-15 (West 2006). Before authorizing the commissioners to obtain such "corporate funds" through the levy or increase of an assessment, the court must make the findings in section 4-24 (70 ILCS 605/4-24 (West 2006)); and, as we have discussed, those findings would have been impossible in this case without the scrutiny of plans, profiles, and specifications, or so the court could have reasonably found.

In its brief, the District assumes that plans, profiles, or specifications could be "applicable" and "necessary" to a petition for an additional assessment (though not to a petition to establish or increase an annual maintenance assessment). See 70 ILCS 605/4-19 (West 2006); In re Petition to Levy Assessments, 19 Ill. App. 3d 125, 131-32, 310 N.E.2d 454, 459-60 (1974). That assumption creates a contradiction in the District's reasoning. According to section 5-1, a drainage district levies an additional assessment for the purpose of doing "repair work." 70 ILCS 605/5-1 (West 2006). The District asserts that a court has no authority to scrutinize the method by which proposed repairs shall be accomplished. If that assertion were correct, plans, profiles, and specifications would be superfluous not only to a petition to increase an annual maintenance assessment but also to a petition to levy an additional assessment, in which a District proposes doing "repair work" (70 ILCS 605/5-1 (West 2006)).

If we accepted the District's argument, all a drainage district would have to say, in its petition for an increase in the annual maintenance assessment, was that it intended to use the additional funds to "maintain the ditch." No amount of specificity would be required. The landowners simply would have to pay; they could not ask disruptive questions about means and methods. Because it would be none of the trial

court's business how the district proposed maintaining the ditch (as the District says, "[t]he manner in which the commissioners may, within their statutory discretion under [section] 4-15, choose to perform maintenance work requires no court approval"), the prima facie case would be practically unassailable and all objections would be ineffectual. In our de novo interpretation of the statute (see Hogan v. Adams, 333 Ill. App. 3d 141, 146, 775 N.E.2d 217, 221 (2002)), we conclude that the legislature intended greater protection for the taxpayer.

As the District points out, once the trial court grants the District authority to increase the annual maintenance assessment to a certain maximum amount, the commissioners of the District have discretion to "determine whether it is necessary to collect all or any portion of the annual maintenance assessment for repair and maintenance work." 70 ILCS 605/5-20 (West 2006). Thus, before authorizing an increase in the annual maintenance assessment, the court may require an adequate explanation of how the funds will be spent, but once the court authorizes the increase, the commissioners thereafter decide how much of the annual maintenance assessment to collect (up to the maximum authorized amount) as well as the goods and services they will purchase in any given year pursuant to the plan they presented to the court. It is clear that after the evidence, the trial court granted enough of an increase to pay for a study, leaving for future proceedings the question of whether any additional increase in the maintenance assessment would be allowed to perform the contemplated capital project.

B. Rebuttal of the Prima Facie Case

Section 4-34 of the Illinois Drainage Code provides as follows:

- 21 -

"The commissioners of a drainage district are officers of the court and[,] as such[,] shall be under the control of the court. Whenever the commissioners, pursuant to any of the provisions of this [a]ct, file a petition or report with the court and such petition or report is verified by a majority of the commissioners, the matters and things therein contained shall be presumed to be correct, and, when introduced in evidence in any such proceeding, shall make out a prima facie case for the district." 70 ILCS 605/4-34 (West 2006).

The District argues that when admitted in evidence, the petition made out a prima facie case for increasing the annual maintenance assessment to $87,453 and the burden shifted to the objectors to rebut the presumption that the contents of the petition were correct. According to the District, the objectors had to produce evidence of either of the following two negative propositions: (1) it was not necessary and advisable to increase the amount of the annual maintenance assessment to $87,453, or (2) the benefits of repairing the ditch would not exceed the cost of doing so. See In re Saline Branch Drainage District, 172 Ill. App. 3d 574, 583, 526 N.E.2d 939, 945 (1988); In re Petition of the Commissioners of McGee Creek Levee & Drainage District, 58 Ill. App. 2d 466, 478, 207 N.E.2d 313, 319 (1965). The District argues that the objectors produced no such evidence.

"A party is not required to make plenary proof of a negative averment. It is enough that he introduces such evidence as, in the absence of all counter testimony, will afford reasonable ground for presuming that the [negative] allegation is true; and when

- 22 -

this is done, the <u>onus probandi</u> will be thrown on his adversary." <u>Graves v. Bruen</u>, 11 Ill. 431, 441 (1849); see also <u>Schmisseur v. Beatrie</u>, 147 Ill. 210, 217, 35 N.E. 525, 527 (1893); <u>Shumak v. Shumak</u>, 30 Ill. App. 3d 188, 191, 332 N.E.2d 177, 180 (1975). The trial court found that the objectors had overcome the District's <u>prima facie</u> case, at least as to any amount of an annual maintenance assessment greater than $55,000 for the first year and $28,000 in succeeding years. We will defer to the factual findings the court made in a bench trial to the extent those findings are not against the manifest weight of the evidence. <u>Kalata v. Anheuser-Busch Cos.</u>, 144 Ill. 2d 425, 433, 581 N.E.2d 656, 660 (1991). A finding is against the manifest weight of the evidence only if the opposite finding is clearly evident, plain, and indisputable from the evidence in the record. <u>Career Opportunities, Inc. v. Grant, Wright & Baker, Inc.</u>, 91 Ill. App. 3d 984, 987, 415 N.E.2d 463, 465 (1980).

We do not find it clearly evident, plain, and indisputable that the objectors failed to produce evidence opposing the District's <u>prima facie</u> case. The District proposed using the $87,453 per year to construct J-hook vanes, bendway weirs, and rock riffles in the bottom of the ditch. Frauenhoffer, a civil engineer, testified it would be "dangerous" and a "very poor choice" to put any structures whatsoever in the channel because such structures inevitably would reduce the hydraulic capacity of the ditch. Another engineer, Bullard, testified it would be imprudent to put any structures in the bottom of the ditch without first using HEC-RAS to calculate the velocity patterns that would result. If a trier of fact believed Frauenhoffer and Bullard, their testimony was "'sufficient to support a finding of the nonexistence of the presumed fact'" (<u>Franciscan Sisters Health Care Corp. v. Dean</u>, 95 Ill. 2d 452, 463, 448 N.E.2d 872, 877 (1983),

quoting M. Graham, Presumptions in Civil Cases in Illinois: Do They Exist? 1977 S. Ill. U. L.J. 1, 24 (1977)), namely, that it was necessary and advisable to increase the annual maintenance assessment to $87,453. From Frauenhoffer's and Bullard's testimony, the trial court could have concluded it was not necessary and advisable to increase the annual maintenance assessment to that amount because the District intended to use most of the funds to do something that two engineers considered to be risky: putting structures in the bottom of the ditch.

When the objectors came forward with evidence opposing the statutory presumption, the presumption vanished. See Franciscan Sisters, 95 Ill. 2d at 461, 448 N.E.2d at 876. The burden of production then shifted back to the District, which had the ultimate burden of persuasion all along. See Franciscan Sisters, 95 Ill. 2d at 462, 448 N.E.2d at 876-77; Commissioners of McGee Creek Levee & Drainage District v. Sides, 336 Ill. 267, 272, 168 N.E. 283, 285 (1929). The District called Kinney, who testified, essentially, that structures in the bottom of the ditch would have no significant effect on the hydraulic capacity of the ditch and that computer modeling was unnecessary. The trial court could have believed Bullard and Frauenhoffer over him. The court was in the best position to assess the credibility of the witnesses and determine the weight their testimony deserved. See Greene v. City of Chicago, 73 Ill. 2d 100, 110, 382 N.E.2d 1205, 1210 (1978).

C. Spending $27,000 on a Long-Term Maintenance Plan

The District argues: "The trial court had no authority to order the District to spend $27,000.00 for a long[-]term maintenance plan." We do not see where the court did so. See 210 Ill. 2d R. 341(h)(6) ("facts necessary to an understanding of the

case, stated accurately and fairly *** and with appropriate reference to the pages of the record on appeal").  In its order of November 30, 2007, the court "[found] that the $27,000.00 required for the preparation of the long[-]term plan [was] both appropriate and advisable."  Obviously, the court contemplated the District would spend the $27,000 on the preparation of a long-term maintenance plan, but, as far as we can see, the court did not affirmatively order the District to do so.  Undoubtedly, if the District did not use the funds for the purposes it represented it would use them, an objector would have a good argument for the repeal of the increase in the annual maintenance assessment.  See 70 ILCS 605/5-19 (West 2006).  Insomuch as the judgment could be construed as implicitly ordering the preparation of a long-term maintenance plan, section 5-24 says the court shall "order the things to be done" (70 ILCS 605/4-24 (West 2006).

## D. Reduction of the Assessment in Succeeding Years

The District argues the trial court lacked statutory authority to "manipulate the annual maintenance assessment" by authorizing a greater amount in the first year and lesser amounts in succeeding years.  We disagree.  The court had the discretion to deny an increase at all.  Given that plenary power of restriction, it would seem to follow, by corollary, that the court could impose a lesser form of restriction by authorizing a lower amount of assessment in succeeding years than in the first year.

## E. The Late Objections

The District complains that the trial court lacked statutory authority to hear any objections except the timely objection filed by DiNovo.  Section 4-23 of the Illinois Drainage Code states that all objections to a petition are to be filed "at or prior to

the time fixed for hearing." 70 ILCS 605/4-23 (West 2006).

Under Illinois law, forfeiture does not inevitably follow from failure to meet a procedural deadline. A line of cases discusses the mandatory-directory dichotomy. E.g., O'Brien v. White, 219 Ill. 2d 86, 96-97, 846 N.E.2d 116, 122 (2006); People v. Robinson, 217 Ill. 2d 43, 53-54, 838 N.E.2d 930, 936 (2005). The District does not cite these cases in its brief, let alone explain why they require a finding that the objectors who filed their objections late thereby lost their right to be heard. Absent adequate briefing, we decline to consider this question.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH and MYERSCOUGH, JJ., concur.