2022 IL App (3d) 210294

Opinion filed June 23, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | |
|---|---|
| *In re* HUNT-LIMA DRAINAGE AND LEVEE ) <br> DISTRICT, on Petition for Authority to Levy ) <br> Additional Assessments ) <br> ) <br> (Hunt-Lima Drainage and Levee District, ) <br> ) <br>     Petitioner-Appellee, ) <br> ) <br>     v. ) <br> ) <br> Lance Roskamp; Bob Roskamp, Inc.; Kevin ) <br> Roskamp; Margaret Johnson-Dennis; Johnson- ) <br> Casady Trust; Rocky Run Farms, LLC by Jeff ) <br> Hilst; Carol J. Kiser; John Clark; and Larry ) <br> Tanner, d/b/a Don's Service, ) <br> ) <br>     Objectors-Appellants). ) | Appeal from the Circuit Court <br> of the 9th Judicial Circuit, <br> Hancock County, Illinois. <br><br><br><br><br><br><br><br> Appeal No. 3-21-0294 <br> Circuit No. 10-MC-1 <br><br><br> Honorable <br> William E. Poncin, <br> Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Daugherity and Schmidt concurred in the judgment and opinion.

_____

**OPINION**

¶ 1      Petitioner, Hunt-Lima Drainage and Levee District (District), filed a petition in the circuit court of Henderson County seeking authority to levy an additional assessment on real estate in the drainage district. Several residents objected to the assessment, including objectors Lance Roskamp; Bob Roskamp, Inc.; Kevin Roskamp; Margaret Johnson-Dennis; Johnson-Casady

Trust; Rocky Run Farms, LLC by Jeff Hilst; Carol J. Kiser; John Clark; and Larry Tanner, d/b/a Don's Service (Objectors). The circuit court granted the District's request, and the Objectors appeal. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        The Hunt and Lima Lake Drainage Districts were formed in the late 1800s. In 2010, following a flood event in 2008, the two districts were consolidated, forming the District that currently exists. It encompasses land in Hancock and Adams Counties and consists of approximately 28,700 acres. The District is bounded on the west by the Mississippi River and on the east by diversion canals that redirect water around the District. The primary purpose of the District is to protect land within its borders from the waters of the Mississippi River. Protection is provided by a 17-mile levee along the Mississippi River and two pumping stations that pump water out of the District. Landowners within the District pay an annual assessment of $30 per acre to maintain the levee.

¶ 4        In 2017, the District Commissioners filed a petition in circuit court seeking authority to levy an additional assessment of $30 per acre per year for a duration of 20 years to fund the cost of a levee reconstruction project. The petition described the proposed project in some detail, stating that the design involved dredging approximately 800,000 cubic yards of sand from the Mississippi River and placing it in stockpiles at specific locations along the levee. The dredged sand would then be used to reshape the landside of the existing levee and to create seepage berms of variable widths. The proposed top width of the main reshaped levee was 20 feet, from its original width of 10 feet, with reconstructed top and side slopes. The petition further stated that the cost of the proposed project was $12,957,000 and that the benefit, using damage repair costs from floods in 1993 and 2008, was approximately $42,355,000.

2

¶ 5        Several landowners in the district objected to the levy of an additional assessment to fund the project. They noted that, if approved, the proposal would subject each acre to a total assessment of $60. The objectors owned approximately 11% of the property in the District.

¶ 6        The trial court conducted a hearing on the petition on December 1, 2020. Two of the three commissioners, Dianne Barnett and Jon Hofmeister, testified for the District. They stated that, so far, the District had incurred $520,000 in engineering fees related to the project. The initial design proposed raising the height of the levee and was denied by the United States Army Corps of Engineers (Corps) and the Illinois Department of Natural Resources. The most recent iteration of the project uses levee widening and berm reshaping techniques and has received all necessary permits and approvals from the regulatory agencies involved.

¶ 7        Hofmeister described the levee as being very weak in its current state. He believes that the project is crucial to the stability of the levee. Without the additional protection and sand stockpiles, the District will be unable to protect property within its borders from a flood event.

¶ 8        Barnett testified that she has been a commissioner of the District since it merged in 2010 and was previously a commissioner of the Lima Lake Drainage District. Through her role as commissioner, she interacts with the Corps and Federal Emergency Management Agency (FEMA) "all of the time." She testified that "[t]here really aren't any" alternatives available to the District for funding the project outlined in the petition. She testified that the first proposal submitted to the Corps sought certification for a 100-year flood and proposed raising the height of the levee 6 to 9 inches. The Corps denied that request and instead approved the current proposal for a 50-year flood certification, which does not include a height increase. She stated that repairs to the levee from damage caused by the 2019 flood event have not yet occurred because the Corps is only willing to repair the river side of the levee since there was no breach.

¶ 9    When asked about crop insurance within the District, Barnett testified that the decision to do so is an individual one; the District cannot order landowners to purchase crop insurance. She also explained the impact a drainage district has on real estate taxes. She noted that although this project would increase a landowners drainage district assessment, that increase would be offset by a "debasement" in the property's equalized assessed valuation. She described a debasement as a reduction in property taxes that a parcel receives when it is assessed drainage taxes.

¶ 10    Barnett testified that in addition to the levee and seepage berms, the District utilizes eight pumps to divert water back into the Mississippi River. The pumps are contained in two pumphouses. All but one pump has been refurbished, and the power sources have been replaced.

¶ 11    The District's expert witness was Gavin Risley. Risley holds a master's degree in environmental engineering and is a licensed professional engineer. He serves as a district engineer for 25 to 30 levee and drainage districts in the Midwest, assisting them with permit designs. He conducts slope stability analyses, seepage analyses, and hydraulic modeling as part of his services. He was admitted as an expert witness without objection.

¶ 12    Risley has worked on the District's proposed project for 10 years and has been the lead engineer for the past 5 years. He testified that the District's levee, as constructed based on the original design in 1954, is a 50-year levee. A 50-year levee protects against a 50-year flood event, which means that it protects against a flood having a 2% chance of occurring in any given year.

¶ 13    Risley testified that the District's levee has breached three times since 1954: once in 1960, once in 1993, and once in 2008. After the 2008 breach, the levee was fully repaired by the federal government under the direction of the Corps. In addition to breaches, the levee has experienced several overflows due to excessively high river waters in 1973, 2001, 2013, 2014, and 2019. Risley stated that in its current condition, the levee would not withstand a significant flood event due to

4

excessive seepage and washouts. He also expressed concern that if the levee experienced repetitive failures, crop insurance premiums may rise drastically or become unavailable. Risley testified that the proposed project aids in preventing another levee breach by providing sand that can be "pushed up" temporarily to prevent the levee from overtopping. The additional berm width also reduces seepage, which reduces pumping costs and provides additional protection against levee failure.

¶ 14    In preparation for trial, Risley drafted a report that contained a benefit-cost ratio (BCR) for the proposal to repair the levee. He calculated the benefits and cost using reports and documents generated by the Corps, data from engineering publications, data from previous studies conducted by his firm, and Mississippi River gauge levels.

¶ 15    Through his testimony, Risley described the calculus he used to evaluate the BCR. First, he identified the two main benefits of the project as seepage reduction and flood risk protection. He testified that he used a software program, referred to as "SLIDE," to conduct seepage reduction calculations. The SLIDE software analyzes slope stability and seepage rates and is one of two computer programs relied on in the industry for calculating seepage. Risley described his use of the SLIDE software as follows:

> "You can input different soil parameters. These parameters were gathered through historical data on the levee, as well as soil boring data that we had available. And you input the data, along with the survey cross sectional data from the levee. And we did that for both what we'd call the existing condition—we called the existing condition the actual Corps design condition, and then compared that to a proposed levee condition or levee geometry condition, which would have the width and the berms. So, you can build those cross sections and compare them to see what the

benefits of a project might be, what that might do to your slope stability, as well as your storage."

Using the SLIDE model, Risley estimated that the proposed project would reduce seepage by 6.5% to 34.6%. Applying a mathematical equation, he then calculated that the reduction in gallons pumped based on reduced seepage equated to 2.66 billion gallons per year.

¶ 16    Risley also used pumping data from a document authored by another professional engineer in his firm, John Neyens (Neyens Report). Neyens used the report to calculate pumping data in the McGee Creek District in 2016. Risley explained that he used the Neyens Report to estimate the effects of seepage and calculate a dollar per gallon per minute to pump water out of the District. Although the data in the Neyens Report was derived from pumping data from another drainage district, Risley testified that he verified the data was consistent with the District's pumping conditions. Based on data from the Neyens Report, Risley concluded that it costs approximately $0.00003 to $0.00007 per gallon-pumped to operate a typical drainage district pumping station. Using those dollar figures, he calculated the benefit of reduced pumping costs, or average seepage savings, to be $3,986,250 to $9,301,300 over the lifetime of the project.

¶ 17    Risley testified that his report further discussed the reduced flood risk and the ability to quickly fight a flood during a state of emergency. He calculated the flood risk reduction benefit in the BCR by assuming the project would prevent a levee breach once over the lifetime of the project. He reported that in 2008, when the levee was breached and the District was devastated, the cost to repair the levee system was almost $23 million, as provided in a Corps report drafted by engineer Dennis Johnson (Johnson Report). The Johnson Report listed the cost associated with levee breaches and overflows. The data contained in the Johnson Report was obtained from Corps data that monitored and tracked damages sustained by levee and drainage districts along the Mississippi

6

River from 1973 to 2013. Risley used the Johnson Report to calculate the damages caused by a potential levee failure in the District by adjusting for inflation and expenses. The calculated loss reported in 2008 in the Johnson Report did not include the damage associated with crop loss, structural damage, and relocation.

¶ 18    Based on his calculations, Risley concluded that the benefit of the project outweighed the cost. He projected a lifetime benefit due to seepage reduction of $3,986,250 to $9,301,300; a lifetime benefit due to flood risk reduction of $25,674,650; and a lifetime projected cost of $16,491,375. Using those numbers, he estimated that the project would have a BCR of 1.8:1 to 2.1:1.

¶ 19    Dr. Clark Bullard, a professor at the University of Illinois who specializes in fluid mechanics engineering, testified as an expert for the Objectors. He became a tenured professor in 1975 and taught courses on the BCR analysis for many years. He was asked to review Risley's calculations and offer an opinion. He did not conduct his own seepage analysis.

¶ 20    Dr. Bullard testified that he had several concerns with Risley's BCR calculations. First, he noted that Risley conducted an analysis at three stations along the 17-mile levee, which only accounted for 60% of the length. He believed that percentage did not provide an accurate average for seepage reduction. He also noted that the SLIDE model results were dated 2012 and 2013 and were based on raising the levee, a design model that has since been abandoned. He further maintained that, as provided in the Neyens Report, Risley should have used the lowest value of the estimated seepage pumping costs ($0.00003) rather than the higher value ($0.00007). In addition, he claimed that the District failed to look at other alternatives to reduce seepage, such as more efficient pumps. Overall, Dr. Bullard concluded that the District's BCR showed an exceedingly high number for gallons-per-year seepage.

¶ 21    As to future flood control, Dr. Bullard further testified that the District (1) erred in relying on the Johnson Report, which included figures as to the likelihood of future overtopping with no explanation as to where any of that information came from, and (2) failed to included flood insurance or crop insurance reimbursements in its calculation of damages. Last, Dr. Bullard claimed that Risley's calculations were flawed because his assumption of a 50-year flood event ignored the fact that there is only a 39.5% probability that a 100-year flood will occur during that time. Dr. Bullard ultimately concluded that Risley's BCR calculation was not reliable.

¶ 22    On cross-examination, Dr. Bullard stated that he does not hold a professional engineers license and has not designed a levee system. This is the first time he has evaluated a levee system on the Mississippi River. He also agreed that the SLIDE program is an industry accepted standard for analyzing seepage. He, too, has concerns about the current state of the levee.

¶ 23    In response to Dr. Bullard's assessment, Risley recalculated the project's BCR, and his amended report was admitted without objection. Risley testified that he revised his calculations using most of Dr. Bullard's recommendations. However, he did not adopt Dr. Bullard's 100-year flood calculation. He stated that he used a 63.6% probability rather than a 39.5% likelihood because both the Corps and FEMA indicated that the levee is designed as a 50-year levee. He explained that the likelihood of a 50-year flood in 50 years in 63.6%.

¶ 24    Risley recalculated the average seepage reduction using Dr. Bullard's 60% levee length and the lowest estimate of pumping costs ($0.00003). Those figures yielded a 50-year pumping cost savings of $301,609. He also recalculated the average damages prevented based on a lower elevation and the likelihood of a 50-year flood, rather than simply assuming a 50-year flood would occur, and arrived at a conservative estimate of $18,930,229 in prevented damages. That figure together with the pumping cost savings resulted in a revised benefit calculation of $19,231,838.

8

He then recalculated the BCR using the revised benefit figure of $19,231,838 and the original cost estimate of $16,491,375, to arrive at a new BCR of 1.17. Risley noted that, even based on Dr. Bullard's numbers, the benefits still exceeded the cost of the project.

¶ 25　　　　Objector Lance Roskamp testified that he farms approximately 1180 acres in the District. He has federal crop insurance that protects the farm against total loss. There are various levels of crop insurance coverage farmers can purchase. After the levee breached in 2008, his crop insurance covered 80% of his grain loss at market value. Roskamp testified that he does not know of anyone farming in the District that does not have crop insurance. Roskamp currently pays $34 per acre in real estate taxes and $30 per acre in drainage district assessments. If the additional $30 drainage assessment is approved, he will pay a total tax of $94 per acre.

¶ 26　　　　Photographs of the levee were admitted into evidence. They depicted the current state of the levee and seepage damage to the land-side berms.

¶ 27　　　　The trial court held that it was the District's burden to prove by a preponderance of the evidence that the project was advisable and that the benefits derived exceeded the costs. After reviewing the evidence and arguments presented by the parties, the court determined that the project was necessary and advisable given the condition of the levee. It also concluded that the benefits from the project exceeded the costs to the landowners. The court entered an order allowing the project to proceed in accordance with the District's proposal and granted the commissioners the authority to levy an additional assessment of $30 per acre for 20 years.

¶ 28　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 29　　　　　　　　　　　　　　　A. Trial Court's Findings

9

¶ 30    The Objectors argue that the trial court's findings that the proposed assessment was necessary and advisable and that the benefits to the levee district exceeded the costs were against the manifest weight of the evidence.

¶ 31    The Illinois Drainage Code (Code) (70 ILCS 605/1-1 *et seq.* (West 2020)) provides that the commissioners of a drainage district must petition the circuit court for authority to levy an additional assessment for maintenance or repair costs in a drainage district. *Id.* § 4-19. Section 4-19 of the Code states that the petition "shall contain" certain information pertaining to the proposed project and the additional assessment, including (1) "a statement showing the necessity for or advisability of the levy of the assessment," and (2) "a statement that the benefits to the lands and other property in the district from the proposed work *** exceed the cost to such lands and other property." *Id.*

¶ 32    The filing of a verified petition establishes a *prima facie* case in favor of the drainage district. *Id.* § 4-34; see also *In re Saline Branch Drainage District*, 172 Ill. App. 3d 574, 582-83 (1988). Once the petition is filed, the burden shifts to the objectors "to offer evidence as to the amount of the benefits to the lands in question." *Saline Branch Drainage District*, 172 Ill. App. 3d at 583.

¶ 33    Any landowner in the district may file an objection to the petition. 70 ILCS 605/4-23 (West 2020). When confronted with an objection to a drainage assessment, the trial court is required to conduct a hearing to determine whether (1) it is necessary or advisable to construct the proposed project or to levy the proposed assessment and (2) the cost to the lands and other property in the district will exceed the benefits. *Id.* § 4-24. Both questions must be answered in the affirmative for the district's petition to be successful. *Upper Salt Fork Drainage District v. DiNovo*, 385 Ill. App. 3d 1083, 1094 (2008).

10

¶ 34        "In determining whether the proposed action is necessary or advisable and in determining the cost thereof, the court shall consider environmental values and amenities and may receive testimony from persons especially qualified by reason of training or experience in biological sciences, community planning, natural resource development, conservation, landscape architecture and similar fields." 70 ILCS 605/4-24 (West 2020) A benefit-cost analysis often includes mathematical components, but it cannot be undertaken using a purely mathematical scale. *Commissioners of McGee Creek Levee & Drainage District v. Dennis*, 58 Ill. App. 2d 466, 474 (1965). There is no "invariable standard for the measurement of benefits." *Leonard v. Arnold*, 244 Ill. 429, 439 (1910). Drainage assessments "cannot be determined with the scientific exactitude of temperature or blood pressure." *Dennis*, 58 Ill. App. 2d at 474.

¶ 35        In a bench trial, we defer to the factual findings of the trial court and will not overturn them unless they are against the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is "clearly evident, plain, and indisputable from the evidence in the record." *Upper Salt Fork Drainage District*, 385 Ill. App. 3d at 1097.

¶ 36        Here, the District presented overwhelming evidence that the project was not only advisable but necessary due to the levee's current condition. Moreover, the District demonstrated that there are no alternative methods available to improve or reenforce the levee to the extent necessary to protect the entire district. Barnett, Hofmeister, and Risley testified that the proposed project was the only reasonable way to address the levee's poor condition, that something had to be done, and that leaving the levee in its existing state was not an option.

¶ 37        Evidence also supports the trial court's finding that the benefits resulting from the project exceeded the costs. Risley's testimony and report provided a thorough analysis of the benefits and costs associated with the project. He utilized mathematical computations, statistical data, industry-

11

approved seepage modeling, and government reports to determine the pumping reduction benefits and the flood risk reduction benefits. The Objectors challenged Risley's calculation of the benefits through their own expert, Dr. Bullard. However, when Risley adjusted his benefits calculations to accommodate Dr. Bullard's recommendations, his BCR computation still indicated that the benefits exceeded the costs and his revised calculations were unrebutted.

¶ 38     At the hearing, both parties presented experts who offered their analysis of the project's BCR. The trial court, as the trier of fact, was in the best position to assess the credibility of those witnesses and determine the weight their testimony deserved. See *id.* at 1098. In light of the evidence supporting Risley's computations, we cannot say that the trial court decision to grant the petition to levy an additional assessment was against the manifest weight of the evidence.

¶ 39     The Objectors maintain that the District needed to include a mathematical BCR calculation in its petition to establish a *prima facie* case. We disagree. A petition must include a statement that the benefits exceed the costs. However, a detailed mathematical computation is not required at the petition stage. When a petition is filed, a presumption exists in favor of the district. See 70 ILCS 605/4-34 (West 2020) (whenever the commissioners file a petition, "the matters and things contained therein shall be presumed to be correct, and, when introduced in evidence in any such proceeding, shall make out a prima facie case for the district"); *Saline Branch Drainage District*, 172 Ill. App. 3d at 582-83 (drainage district's properly filed petition constituted *prima facie* case and burden then shifted to objector to offer contrary evidence). Once an objector opposes the assessment, the presumption in favor of the drainage district vanishes, and the district is required to provide evidence in support of its claim that the benefits exceed the costs. *Upper Salt Fork Drainage District*, 385 Ill. App. 3d at 1097-98. In this case, the District's statement in its petition

established a *prima facie* case, and the BCR calculus presented by Risley satisfied the District's burden at trial.

¶ 40                                      B. Admissibility of Software and Reports

¶ 41        The Objectors also challenge the admissibility of the computer software and reports Risley relied on in calculating a BCR, including (1) the SLIDE software, (2) the Johnson Report, and (3) the Neyens Report. According to the Objectors, when expert testimony relies on data obtained from electronic software and reports, the proponent of the expert testimony must offer foundational proof that the underlying data is reliable.

¶ 42        The basic rules of evidence require that a party must lay a proper foundation for the introduction of a document into evidence. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010). To properly authenticate a document, a proponent must present evidence demonstrating that the document is what the party claims it to be. *Id.* at 348-49. Generally, a party establishes the identity of the document "through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact, what its proponent claims it to be." *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 415 (2005).

¶ 43        An expert testifying at trial may offer an opinion based on facts and data not in evidence. See *People v. Williams*, 238 Ill. 2d 125, 137 (2010) (citing *Wilson v. Clark*, 84 Ill. 2d 186, 196 (1981)). Moreover, an expert may rely on facts and data gathered by other experts and nontestifying expert opinions if those facts and opinions are reasonably and customarily relied on by others in the field. *Id*. at 143; *McKinney v. Hobart Brothers Co.*, 2018 IL App (4th) 170333, ¶ 46.

¶ 44    Illinois Rules of Evidence 703 and 705 (eff. Jan. 1, 2011) further provide that facts and data need not be admissible in evidence to be relied on by an expert. Rule 703 states:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011).

Similarly, Rule 705 provides:

> "The expert may testify in terms of opinion or inference and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705 (eff. Jan. 1, 2011).

The cornerstone in applying Rules 703 and 705 is whether the information used by the expert to form his or her opinion is reliable. See *Williams*, 238 Ill. 2d at 137-38 (interpreting identical language in Federal Rules of Evidence 703 and 705 prior to the adoption of Illinois Rules of Evidence 703 and 705).

¶ 45    Scientific evidence is admissible at trial if the methodology or scientific principles upon which it is based are " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004) (quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)). "General acceptance" does not mean universal acceptance; it is sufficient that the underlying method used to generate the expert's opinion is reasonably relied on by other experts in the industry. *Id.* at 530.

¶ 46        We apply the abuse of discretion standard to the Objectors' foundational challenge to the admission of Risley's expert testimony. *Williams*, 238 Ill. 2d at 136. The abuse of discretion standard is a high one. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). A trial court abuses its discretion only if its determination is arbitrary, fanciful, or unreasonable or "where no reasonable [person] would take the view adopted by the trial court." *Id.*

¶ 47        The Objectors first claim that the trial court abused its discretion in admitting the SLIDE software because the foundation for the computer program was inadequate. We note that the Objectors challenged the admission of Risley's report at trial. However, they did not object to the veracity of the SLIDE software, the validity of the software's calculation, or Risley's admission as an expert is the area of seepage reduction. Thus, the Objectors forfeited the foundational issue by failing to object to the SLIDE software and acquiescing in Risley's use of the computer program at trial. See *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 52 (when a party fails to object to the admission of evidence at trial, that party forfeits any argument that it was improperly admitted); *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 92 (where party acquiesces in admission of evidence, he or she cannot contest admission on appeal even though the evidence is improper).

¶ 48        Forfeiture aside, we conclude that the trial court did not abuse its discretion in admitting Risley's opinion testimony based on the SLIDE data. Risley testified that the SLIDE software was based on scientific methodology and principles and that he used the program to calculate seepage by inputting specific measurements from the District's levee project. In addition, the Objectors' expert, Dr. Bullard, testified that the SLIDE software was an industry acceptable program for analyzing seepage reduction. Evidence established that Risley based his opinion on information reasonably relied on by experts in his field. Therefore, the trial court did not err in admitting Risley's testimony regarding the data he generated using the program. See *Williams*, 238 Ill. 2d at

15

138-41 (concluding that trial court did not abuse its discretion in admitting DNA expert's testimony regarding DNA evidence where she based her opinion on data obtained from electronic equipment and the work of other DNA analysists).

¶ 49    Second, the trial court did not abuse its discretion in admitting the Neyens Report. Risley described the methodology used to generate the report. He further testified that he verified the scientific data upon which it was based with the District's pumping data to ensure it provided an adequate representation of the pumping costs the District sustained. Thus, Risley's testimony established a proper foundation for the admission of the Neyens Report.

¶ 50    Last, we find no error in the trial court's decision to admit the Johnson Report. The Johnson Report was generated by the Corps based on 40 years of Mississippi River flood data. Several footnotes in the report provide detailed descriptions of the methodology of the damage calculations. Moreover, Risley's testimony authenticated the document. He testified that the report is relied on by experts in the industry in assessing damage prevention of Mississippi River levee systems. He further explained that the values in the report represented the cost of damage prevention for the correlating year in which the flood occurred and that the Corps updated it annually. The trial court did not abuse its discretion in admitting the Johnson Report.

¶ 51                              III. CONCLUSION

¶ 52    The judgment of the circuit court of Hancock County granting the District's petition to levy an additional assessment is affirmed.

¶ 53    Affirmed.

16

2022 IL App (3d) 210294

| **Decision Under Review:** | Appeal from the Circuit Court of Hancock County, No. 10-MC-1; the Hon. William E. Poncin, Judge, presiding. |
|---|---|
| **Attorneys for Appellant:** | Carissa Ann Bryant, of Tucker, Hartzell & Bryant, of Carthage, for appellants. |
| **Attorneys for Appellee:** | John N. Hauk, of Hauk & Owens, LLC, of Quincy, for appellee. |