In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-2333

KANSAS CITY SOUTHERN RAILWAY CO. and
NORFOLK SOUTHERN RAILWAY CO.,

*Plaintiffs-Appellant*s,

*v.*

RUSSELL E. KOELLER, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-3094—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 29, 2010—DECIDED JULY 27, 2011

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* The Railroad Revitalization and Regulatory Reform Act ("4-R Act") prevents states and their subdivisions from imposing discriminatory taxes against railroad carriers. 49 U.S.C. § 11501. In 2008, the Sny Island Levee Drainage District ("Sny Island" or "District"), a subdivision of Illinois, changed its long-

standing method for calculating assessments due from railroads and other properties within its system. Two rail carriers—Kansas City Southern Railway Company and Norfolk Southern Railway Company (collectively "Railroads")—brought suit under the residual clause of the 4-R Act, which prevents imposition of "another tax that discriminates against a rail carrier." *Id.* § 11501(b)(4). After the district court held that the assessment qualifies as "another tax" actionable under subsection (b)(4), the Railroads sought a preliminary injunction. The case proceeded to a bench trial, after which the district court entered judgment for Sny Island on the ground that it was powerless to enjoin the tax. While we agree with the district court that Sny Island's assessment should be characterized as a "tax" for purposes of the 4-R Act, we conclude that the court erred in its assessment of its authority to enjoin the tax as discriminatory. Accordingly, we reverse and remand.

## I

For over a hundred years, Sny Island has operated in central Illinois a levee and drainage system that is designed to prevent the Mississippi River from flooding a 60-mile, 114,000-acre area. (For an interesting account of the checkered history of such efforts all along the Mississippi, see JOHN M. BARRY, RISING TIDE: THE GREAT MISSISSIPPI FLOOD OF 1927 AND HOW IT CHANGED AMERICA (1997).) The overwhelming majority of the protected land, some 99.5 percent, is used for agricultural purposes. The remaining fraction of a percent includes

residential, commercial, utility, and railroad lands. The Railroads are two of 700 landowners within the District. Overall, their holdings are quite small: 210 acres belongs to Kansas City Southern, and just over 145 acres to Norfolk Southern.

To enable Sny Island to fund its general operations, the Illinois Drainage Code empowers the District's commissioners to "levy assessments upon the lands and other property benefitted" by the levee system. 70 ILCS 605/4-18. The Drainage Code provides for annual levies, and historically the District took advantage of this authority. 70 ILCS 605/5-1, 5-19. In order to increase an existing "annual maintenance assessment," Sny Island commissioners must petition the Pike County Court for authorization. 70 ILCS 605/4-19. In evaluating a petition, the county court considers whether a proposed assessment is "necessary or advisable" and whether "the cost thereof to the lands and other property in the district will exceed the benefits thereto." 70 ILCS 605/4-24. If the proposal is not necessary or advisable or its costs outweigh its benefits, "the court shall dismiss the petition." *Id.* Whenever the commissioners file a petition, they are required to send out notices of the proposed assessment and advise property owners when the court will conduct its hearing so that objections, if any, can be considered. 70 ILCS 605/4-20 to 24.

For decades, Sny Island collected a uniform annual maintenance assessment from all its landowners. To calculate the amounts due, Sny Island simply divided its operating budget by the total number of benefited

acres and assessed a per-acre fee to each landowner based upon the number of acres owned. These rates were also adjusted, in small measure, to account for the elevation of each tract. On average, landowners paid $8.50 per acre. This rate had been in place since 1987 and, by all accounts, it provided sufficient funding for the District. After severe floods in 2008, coupled with a sharp increase in the price of diesel fuel (which is used to operate the drainage pumps), however, the District's operating funds and its emergency coffers ran dry. Accordingly, in February 2008 Sny Island's commissioners decided they needed to increase the annual maintenance assessment for 2009.

Between March and June 2008, the commissioners debated how much of an increase in the annual assessment was needed. Initially they considered a $5-per-acre increase, but when their projected needs doubled (primarily because of the still-rising cost of diesel), they settled on a $10-per-acre increase; the 2009 assessment was therefore expected to average $18.50 an acre. In a break from tradition, however, the commissioners chose not to apply this rate uniformly. Instead, they opted to differentiate by property type.

Most significantly for our purposes, the commissioners decided that land owned by railroads, pipelines, and utilities (to which everyone in this case refers as the "RPU" properties) would not be assessed on a per-acre formula. This change was proposed only for the RPU properties; all other landowners—that is, 692 of the 700 landowners within the District—would continue to be

charged on a per-acre basis. Of those 692 owners, the vast majority are engaged in agriculture, 14 conduct commercial and industrial operations, and a handful represent residential uses. The RPU properties are easy to identify: the two Railroads involved in this case, four pipelines, and two utilities—an electric company and a telephone provider. The commissioners took the position that the per-acre formula "underassessed" RPU lands—especially Railroad lands—and so they decided to calculate their 2009 assessment for this small group on a "benefit" basis. (We discuss below what they meant by that.) The commissioners also asserted that the Drainage Code, which requires the commissioners to prepare an "assessment roll of *benefits*, damages and compensation" for each property in the district, supported this shift. 70 ILCS 605/5-2 (emphasis added).

From July through early August 2008, the commissioners set out to determine (1) what benefit Sny Island's levee system conferred upon RPU properties and (2) how much of that benefit should be subject to a fee. For assistance, Sny Island hired David Human, an attorney specializing in flood protection projects. Taking the second determination first, Human testified that he wanted to "make sure that the assessments were equitable and proportionate" between agricultural and RPU properties. He began by figuring out an "assessment ratio" based upon the $18.50 fee for non-RPU land that the commissioners had already decided to levy. Human estimated that the agricultural lands received a $280-per-acre benefit from the levees and, dividing $18.50 by $280, arrived at an "assessment ratio" of 6.6%.

The source of this $280 "benefit" figure for the agricultural lands is, to put it charitably, unclear. Human claims to have taken three primary factors into account: the difference in value between land within the District and the land outside the levees; the annual crop rentals being paid to landowners; and the agricultural production of lands within the District. Based solely upon their personal experiences, the commissioners assumed that land inside their levees was worth $6,000 per acre, while unprotected ground was worth approximately $2,500 an acre. (The record does not reveal how far this "unprotected" ground was from the river.) This showed, Human thought, that the benefit from Sny Island was $3,500 per acre. He did not, as far as we can tell, take any other criteria, such as proximity to transportation, quality of soil, or topography, into account. Human applied an unexplained 8% "capitalization rate" to that figure, which came to $280. He then looked at a March 2008 report describing the crop production records and budgets published by the Department of Agricultural and Consumer Economics at the University of Illinois. Looking at the reported "operator and land return values," which he thought averaged $560, Human divided the production average in half on the assumption that owners engage in a 50/50 crop share—which is the cash rental value—and would thereby have a $280 return per acre. Once again, there was no hard data to support those numbers. Crop returns in central Illinois (where Sny Island is located), for example, averaged $418 for high productivity farmland and $358 for low productivity farmland, nowhere near $560. Northern and Southern

Illinois land averages are even lower. Nonetheless, Human thought in the end that "all the numbers were tending towards $280 an acre," and so that is the number he and the commissioners decided to use.

For measuring the benefit to RPU properties, Human's basic goal was to find a uniform system. He assumed a hypothetical flood without the benefit of drainage levees, and then determined what costs are typically saved by the existence of levees. Here, too, his methodology was sorely lacking. Human looked to (1) "decreased maintenance costs" (by which he meant the costs of repairing any structural damage caused by a flood) and (2) "increased physical efficiency costs" (the financial loss caused by not being able to operate due to a flood) attributable to the District's services. Human's estimate of the increased physical efficiency was curious: he assumed "that the value of the physical efficiency of having the [property] is at least equal to the costs of [the property]." This prompted him to use the estimated cost of *replacing* property as a basis for determining *efficiency*. Thus, for the Railroads, Human multiplied the total cost of replacing the rail line—which includes ballast (the layer of crushed rock on which the railroad track is laid), track, ties, and embankments—by the number of days he expected the rail line to be closed as a result of a flood or clean-up following a flood. Though he made the same estimate for pipelines and utilities, based upon the assumed cost to replace the pipeline, electricity tower, or telephone pole, his decision to use "greenfield" replacement costs for the Railroads vaulted their assumed "benefit" well above other RPU properties.

The formula that Human created took the sum of (A) the decreased maintenance costs and (B) the increased physical efficiency to determine the total "benefit" conferred by the District. That number was then multiplied by the 6.6% assessment ratio he had derived earlier.

Human made different assumptions about flooding for the Railroads than he did for the pipelines and utilities. For the latter two, Human assumed a "significant flood" (468 feet above mean sea level) that would affect either overhead distribution (for the utilities) or buried gas lines (for the pipelines). He assumed that the frequency of such flooding would be once every six months, but that damage would occur only once every third flood. To support these numbers, he relied upon flood-rate data complied by the U.S. Army Corps of Engineers between 1993 and early 2008, using river-height measurement gauges. His approach to the Railroads was much more involved. His worksheets set forth three types of floods: a 16- to 17-foot flood, roughly once every 1.5 years, that would affect ballast and close the railroad for 24 days; a 20-foot flood, once every 1.77 years, which would send the river over the top of the railroad, require ballast cleaning and resurfacing, and close the railroad for 37 days; and a 24-foot flood every four years, which would cause a complete scour, erosion of the railroad embankment, and close the railroad for 40 days. Though these numbers were roughly based upon the Army Corps' river-data, some of Human's calculations and assumptions, as reflected on the worksheets, depart from these data without any explanation.

The results of Human's formula over-shot the amount Sny Island thought that it could justify, either as a matter of its expected budget or the Drainage Code, and so the commissioners asked Human to work with the District's superintendent and treasurer, Michael H. Reed, to "refine" the numbers. See 70 ILCS 605/5-1 (requiring proportional assessment). Reed and Human played for a while with the numbers, assuming a lower flood rate for the 24-foot flood (changing it to eight years), claiming to fix a "math error" that remains unspecified, and recalculating the "benefit" amount. In the end, the commissioners adopted a benefit figure of $1,296,125 for Kansas City Southern and $1,422,990 for Norfolk Southern. As before, these numbers were then multiplied by the 6.6% ratio. Though significantly lower than Human's first attempt, for the Railroads this "refined" assessment represented an astronomical increase in assessment: $85,545 for Kansas City Southern, a 4800% increase over its 2008 assessment of $1,774, and $93,920 for Norfolk Southern, an 8300% increase over its 2008 assessment of $1,126. Had the Railroads been assessed on a per-acre basis for 2009, Kansas City Southern would have been obligated to pay $3,898, while Norfolk Southern would have owed $2,578.

In addition to distinguishing between RPU and non-RPU lands, the commissioners made a second change to their assessment collections. They decided to exempt land within municipalities; that land had been charged $5 per lot under the old system. The commissioners concluded that the costs of mailing and collecting monies from property owners within municipalities would out-

weigh the benefits the District could expect, even if it raised the assessment to $25 per lot. Not finished yet, the commissioners also assumed that all 14 non-RPU commercial and industrial properties were located within municipal limits. That assumption was incorrect, as they must have known; six commercial and industrial properties are located beyond municipal limits. These six parcels were assessed on the per-acre basis, subject only to the $10 increase between 2008 and 2009. Sny Island says now that it inadvertently overlooked these properties because of the overwhelming stress the commissioners were under as they struggled to combat extensive flooding.

The commissioners finalized these numbers and filed a petition for authorization with the Pike County Court. The commissioners published notices in local newspapers and then sent a notice about new assessments to all landowners within the District. The notice stated that the "reassessment, if approved, would generally result in a maximum $10.00-per-acre increase in annual drainage assessment to benefitted agricultural land in the District." The notice said nothing about the District's new distinction between per-acre assessments for agricultural land and benefit-based assessments for RPU properties, nor did it mention the exemption for land within municipalities. The county court conducted an evidentiary hearing on the petition in October 2008 and heard objections by some agricultural landowners over the fee increase. Having no reason to believe that their assessment would increase by more than $10 per acre, the Railroads did not object to the assessment or attend

the hearing. The court determined that the proposed assessment was "necessary and advisable"; found that Sny Island complied with all notice requirements; and certified the new assessment.

The Railroads discovered what was about to happen to them when they received their bills in January 2009. Instead of paying, they filed suit under subsection (b)(4) of the 4-R Act. Sny Island moved to dismiss on jurisdictional grounds, arguing that the *Rooker-Feldman* doctrine precluded federal review of the assessment because it was the result of a state court's judgment. The district court denied the motion. It then ruled that Sny Island's annual maintenance fee was a "tax" within the meaning of subsection (b)(4). In the same order, the court denied the Railroads' request for a preliminary injunction on the basis that they had not put forth any evidence that the "assessed value" of the Railroads' land exceeded its "true market value" by at least five percent, which the district court reasoned was required by the 4-R Act. The district court acknowledged that market value evidence is "unnecessary to prove a violation of" subsection (b)(4), but it thought that it could not order a preliminary injunction under subsection (c) of the Act without it. See 49 U.S.C. § 11501(c).

Following a bench trial, the district court changed course. It concluded that the Railroads had failed to prove a *violation* of subsection (b)(4) because the court could not locate "evidence relating to the true market value of lands within the District" in the record. And, because the Railroads "had the burden of demonstrating discrimi-

natory impact," and they had not done so, it found that their claim failed "for lack of proof." The court noted that the process employed by the commissioners to develop the 2009 assessment "raises questions about their intent to discriminate against" the Railroads, but it held that intent was irrelevant. It accepted the District's argument that its failure to tax the six commercial and industrial properties outside of the municipal boundaries on the same basis as other RPU properties was "inadvertent," saying that it "trust[ed]" that the commissioners would assess these properties in the same manner as the other RPU properties going forward. The Railroads have now appealed.

## II

We start, as we must, with jurisdiction. Sny Island renews its contention that the *Rooker-Feldman* doctrine deprived the district court of jurisdiction because the county court approved the fee. See generally *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). Under *Rooker-Feldman*, "lower federal courts do not have jurisdiction to conduct direct review of state court decisions," or to review claims "inextricably intertwined" with a state court's judgment. *Lewis v. Anderson*, 308 F.3d 768, 772 (7th Cir. 2002). Only the Supreme Court, Congress has determined, can engage in such appellate review. See 28 U.S.C. § 1257; *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896, 900 (7th Cir. 2010).

The *Rooker-Feldman* rule is inapplicable here. The parties debate whether the state court was acting in a "legislative" capacity, which would remove the pro-ceeding from the ambit of *Rooker-Feldman*. See *Feldman*, 460 U.S. at 476-77; *Leaf v. Supreme Ct. of Wis.*, 979 F.2d 589, 596-98 (7th Cir. 1992). Because the court was approving a fee, we might be inclined to agree. *Cf. Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908) ("The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind."). But we need not address this dispute because *Rooker-Feldman* would not apply even if this were a judicial action. The *Rooker-Feldman* doctrine is "confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 248 (2005); see also *Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011); *Lance v. Dennis*, 546 U.S. 459, 464 (2006); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 431-32 (7th Cir. 2009). As Sny Island concedes, the Railroads were not present at the state court's hearing, nor were they a "party" there. Accordingly, they cannot be characterized as "state-court losers" complaining of a judgement rendered against them. *Cf. Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994) ("[T]he invocation of *Rooker/Feldman* is . . . inapt here, for unlike *Rooker* or *Feldman*, the [plaintiff] was not a party in the state court.").

The fact that the 4-R Act provides an independent federal right of action reinforces this conclusion. The

Railroads are not seeking review of a state-court judgment. They do not care whether the District's new assessment is "necessary or advisable," or whether Sny Island complied with the Drainage Code's notice requirements. Instead, they raise the independent argument that the fees amount to tax discrimination under the 4-R Act. *Cf. Skinner*, 131 S. Ct. at 1297 (explaining that a "state-court decision is not reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action"); *Hemmer v. Indiana Bd. of Animal Health*, 532 F.3d 610, 614 (7th Cir. 2008). Our jurisdiction is secure.

## III

On the merits, the Railroads present two questions for our consideration: first, whether the assessment charged by Sny Island constitutes "another tax" within the meaning of subsection (b)(4) of the 4-R Act; and second, if so, whether that tax impermissibly discriminates against them.

## A

We begin, as we must, with the language of the statute. *CSX Transp., Inc. v. Alabama Dep't of Rev.*, 131 S. Ct. 1101, 1107 (2011); see *Carter v. Tennant Co.*, 383 F.3d 673, 682 (7th Cir. 2004). The 4-R Act provides that a state and its subdivisions may not:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail

transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b).

The Act does not define the term "tax," nor does it offer any other guidance about what falls within its ambit. *CSX Transp.*, 131 S. Ct. at 1107. For subsection (b)(4), as *CSX Transportation* recently emphasized, the "meaning of 'tax' is expansive," and the phrase "another tax," is "best understood to . . . encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)-(3)." *Id.* In other words, the "phrase 'another tax' is a catch-all." *Id.; see also Burlington N. Ry. Co. v. Superior*, 932 F.2d 1185, 1186 (7th Cir. 1991) ("[Subsection (b)(4)] is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type

of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax . . .—whatever.") ("*Superior*").

Even granting that the term "tax" is a broad one, however, we must still distinguish between a "tax" on one hand and a "special assessment" or "fee" on the other. See *Illinois Central R.R. Co. v. Decatur*, 147 U.S. 190, 197-99 (1893) ("*Decatur*"); compare *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* No. 09-3975, 2011 WL 2652201, at *5-6 (7th Cir. July 8, 2011) (*en banc*) (distinguishing among taxes, fees, and other exactions for purposes of the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341). The 4-R Act does not apply to the latter. *Union Carbide Corp. v. Bd. of Tax Comm'rs*, 69 F.3d 1356, 1359 (7th Cir. 1995) ("*Union Carbide*"); see *Chicago & N. W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*, 71 F.3d 265, 266 (8th Cir. 1995) ("Because the board is not violating the 4-R Act if it is not taxing the railroad, our first inquiry must be whether imposing . . . costs . . . on the railroad constitutes a tax within the meaning of [subsection (b)(4)].").

In order to decide whether Sny Island's "annual maintenance assessment" is a "tax" actionable under subsection (b)(4) or a non-actionable "assessment" or "fee," it is useful to compare it similar exactions that courts have examined in the past. We begin with the Supreme Court's *Head Money Cases (Edye v. Robertson)*, which considered a congressional act that required a "'duty of fifty cents for each and every passenger, not a citizen of the United States, who shall come by steam or sail vessel from a foreign port to any port within the United States.'" 112 U.S. 580, 589-90 (1884) (quoting 22 Stat. 214). The

money collected was then paid into the U.S. Treasury, but was segregated into a special "'immigrant fund . . . to defray the expenses of regulating immigration.'" *Id.* at 590. The petitioners challenged the law on the ground that the act went beyond the taxing power of Congress as laid out in Article I. See *id.* at 594. The Court responded that the "true power exercised" was not the taxing power at all. Instead, it was a "fee," because the "sum demanded" did not go "to the general support of the government," but was a "fund raised from those who are engaged in the transportation of these passengers." *Id.* at 596. See also *Union Pac. R.R. Co. v. Pub. Util. Comm'n of Or.*, 899 F.2d at 854, 858-59, 861 (9th Cir. 1990).

Second, *Houck v. Little River Drainage District* considered a challenge on behalf of several landowners under the Takings Clause to a 25-cent per-acre fee "levied generally upon the lands" within a drainage district, 239 U.S. 254, 259 (1915). Like the District here, the drainage district was a political subdivision of the state, and it had the power to tax those within its jurisdiction. *Id.* at 262. In the course of addressing the takings argument, the Court defined a "tax" as "an enforced contribution for the payment of public expenses," which is "laid by some rule of apportionment according to which the persons or property taxed share the public burden." *Id.* at 265. By contrast, when "local improvements may be deemed to result in special benefits, a further classification may be made and special assessments imposed accordingly." *Id.*; see also *Decatur*, 147 U.S. at 208 (using similar language). *Houck* also noted that this distinction

does not depend on the fact that the drainage district, not the state directly, was levying the fee because "whether taxation operates upon all within the State, or upon those of a given class or locality, its essential nature is the same." 239 U.S. at 265.

In our case, the district court relied on *Houck* and concluded that the District's exaction was a "tax" for purposes of subsection (b)(4). This resolution is faithful to *Houck* and is also consistent with our approach to the problem of characterization in *Empress Casino*. There, we rejected a multi-factor approach in favor of a clean line between taxes, which are designed to generate revenue, and other exactions designed either to punish or to compensate for a service that the state provides. 2011 WL 2652201, at *5-6. Flood control, from that perspective, cannot be considered an optional service that someone might want to take or leave. It is just as much a public responsibility as the provision of roads or sewage. The District's annual exaction distributes the cost of this public good across all of those living within Sny Island, not just the Railroads or even RPU properties. Everyone in the District (indeed, arguably everyone in the state, to the extent that state monies are typically expended for disaster relief) benefits by having fewer or less extreme floods when the Mississippi begins to swell. Unlike other fees, which might pertain only to certain property-holders in the District or fund one-time projects, the annual maintenance assessment provides funding for the widely-dispersed, general "work of the district." 70 ILCS 605/5-1; see *id.* (defining "additional assessments" in contradistinction to "annual maintenance assess-

ments"); *Upper Salt Fork Drainage Dist. v. DiNovo*, 904 N.E. 2d 84, 93, 95 (Ill. App. 2008) (distinguishing "additional assessments" and "annual maintenance assessments").

Treating Sny Island's assessment as a tax is also consistent with the *Head Money Cases*. These cases "stand for the proposition that a government levy is a tax if it raises revenue to spend for the general public welfare." *Chicago & North Western*, 71 F.3d at 267; see also *Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Penn.*, 141 F.3d 88, 96 (3d Cir. 1998). Contrary to the District's view, the fact that the levee district covers less than the entire state of Illinois is immaterial. See, *e.g.*, *Houck*, 239 U.S. at 265 (focusing on a drainage district's fee); *Kansas City S. Ry. Co. v. Road Improvement Dist. No. 6*, 256 U.S. 658, 660 (1920) (finding tax discrimination in a local drainage district's assessment, and affirming the state's power to "create taxing districts to meet the expense of local improvements" (internal quotation marks and citations omitted)). The text of the 4-R Act itself precludes the District's interpretation, because the statute applies to a state *and its subdivisions*. 49 U.S.C. 11501(b); see *CSX Transp.*, 131 S. Ct. at 1105; *cf. Western Air Lines, Inc. v. Bd. of Equalization*, 480 U.S. 123, 131 (1987) (explaining that "the 4-R Act demonstrates Congress' awareness that interstate carriers 'are easy prey for State and *local* tax assessors' in that they are 'nonvoting, often nonresident, targets for *local* taxation,' who cannot easily remove themselves from the *locality*." (quoting S. Rep. No. 91-630, p. 3 (1969) (emphasis added)); *Superior*, 932 F.2d at 1186.

Our sister circuits share this interpretation of the 4-R Act. In *Chicago & North Western*, the Eighth Circuit consid-

ered a charge imposed by a drainage district that ordered a railroad to install a new culvert on railway land in order to keep its right-of-way intact as the district widened a drainage ditch. 71 F.3d 265. The railroad refused, and so the district built the culvert and then sought reimbursement. In finding this exaction not to be a "tax," the Eighth Circuit distinguished the situation from an instance where the expenditure was for the cost of widening the ditch, an improvement that would benefit the "general public." *Id.* at 267. Because the railroad was the only beneficiary of the culvert, the fee was not a tax. *Id.* Similarly, in *Wheeling & Lake Erie* the Third Circuit considered a fee charged against a railroad for a portion of the construction and maintenance costs for a new bridge that preserved the railroad's right-of-way. 141 F.3d at 90-91. The bridge initially had been paid for by the local town. Another railroad was charged a similar fee, as was the state's department of transportation, and the state's bridge project fund picked up the bulk of the tab. *Id.* Though the bridge served some public benefit, the court deemed the fee an "assessment" because it did not raise revenue for the "general fund" of the town, *id.* at 96. More importantly, it conferred a particular benefit on the railroad—one that the railroad could have foregone, if necessary. *Id.* at 96-97. It was thus unlike the District's exaction, which applies across-the-board to the property owners in the district, goes into the District's "general fund," and supports a broad public system. See also *Decatur*, 147 U.S. at 208-09; *Utility Comm'n of Or.*, 899 F.2d at 858-59.

As we have already noted, characterizing the District's exaction as a tax is consistent with our reading of the

Tax Injunction Act. Other courts have also seen the close relation between these two statutes. See, *e.g.*, *Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 929-30 (9th Cir. 1996); *San Juan Cellular Tel. v. Pub. Servs. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992). This is no accident: consistency is essential, because the 4-R Act's remedial provision provides an exception to the TIA. 49 U.S.C. § 11501(c).

In summary, the District's exaction, as the commissioners concede, raises general revenues, and its ultimate use is for the whole District. Unlike an assessment for a small project, the money raised is available for all the work of the District; no particular expenditure is tied to a particular benefit obtained by a specific taxpayer. The commissioners use their funds to pay their salaries, make repairs to levees far away from railroad property, purchase new equipment, and pay for diesel fuel to operate the pumps. Bearing in mind the expansive reading of the term "tax" that the Supreme Court has endorsed, this is enough to make it a "tax" for purposes of the 4-R Act." *CSX Transp.*, 131 S. Ct. at 1107.

B

The remaining question is whether the District's tax discriminates against the Railroads. In order to answer it, we must first determine "the class of taxpayers with whom the railroads are to be compared." *Union Pac. R.R. Co. v. Minnesota Dep't of Rev.*, 507 F.3d 693, 695 (8th Cir. 2007); see also *Alabama Great S. R.R. Co. v. Eagerton*, 541

F. Supp. 1084, 1086 (M.D. Ala. 1982). After selecting a comparison class, we must then decide whether the record reveals actionable discrimination.

1. *The comparison class.*

The proper approach toward defining the appropriate class for comparison under subsection (b)(4) has divided the circuits, and the Supreme Court's most recent decision in this area, *CSX Transportation,* declined to resolve the split. 131 S. Ct. at 1107 n.5; see *id.* at 1115, 1118 n.3 (Thomas, J., dissenting) (noting the division of authority); *Norfolk S. Ry. Co. v. Alabama Dep't of Rev.*, 550 F.3d 1306, 1308 n.3 (11th Cir. 2008) (collecting cases), abrogated on other grounds by *CSX Transp.*, 131 S. Ct. 1101. The critical question appears to be the proper level of generality for analysis: as applied to our case, should one take (1) a universal approach, looking at all property owners within the District; (2) a functional approach, looking at other commercial and industrial property; or (3) a competitive approach, focusing on a railroad's chief competitors as a baseline for finding discrimination? Compare, *e.g.*, *Burlington N. Santa Fe Ry. Co. v. Lohman*, 193 F.3d 984, 985 (8th Cir. 1999) (adopting the competitive option), with *Atchison, Topeka, and Santa Fe Ry. Co. v. Arizona*, 78 F.3d 438, 441-42 (9th Cir. 1996) (applying a functional approach), and *Kansas City S. R.R. Co. v. McNamara*, 817 F.2d 368, 375-76 (5th Cir. 1987) (same).

We can easily reject the universal approach, which the Railroads have advocated. No appellate court has gone

this far, and we think this interpretation was foreclosed by *Department of Rev. v. ACF Industries*, 510 U.S. 332 (1994). *Cf. CSX Transp.*, 131 S. Ct. at 1119 n.4 (Thomas, J., dissenting) ("A comparison class of 'anyone' is broader than either of the sides in the lower courts' split on this issue."). In *ACF Industries*, the court explained that the "interplay between subsections (b)(1)-(3) and the definition of 'commercial and industrial property' in subsection (a)(4) is central to interpretation of subsection (b)(4)." 510 U.S. at 340. Subsection (a)(4) defines commercial and industrial property to exclude "land used primarily for agricultural purposes," 49 U.S.C. § 11501(a)(4), which perfectly describes 99.5% of the land encompassed by Sny Island. Under *ACF Industries*, the "fact that Congress made this particular exclusion demonstrates its intent to permit the States to tax railroad property at a higher rate than agricultural land, not withstanding subsection (b)(3)'s general prohibition of rate discrimination." 510 U.S. at 340. The rationale supporting *ACF Industries*, under which states are allowed to distinguish between agricultural land and other land, even to the extent of exempting the former, is applicable here as well. To hold otherwise, would prevent the same type of basic disparities allowed by the structure of subsection (b).

The more difficult choice is between a functional approach and a competitive approach. Of the two, the one more favorable to Sny Island is the functional approach; indeed, it urges us to compare its treatment of the Railroads to that of other "commercial and industrial taxpayers." This finds some support in our earlier decision

in *Superior*, where we said that a "state is confined to taxing railroads as members of larger taxpayer groups—owners of commercial or industrial property, recipients of gross income, recipients of net income, whatever." 932 F.2d at 1188. In so holding, we drew on the Fifth Circuit's opinion in *McNamara*, *supra*, which set out the rationale for adopting the comparison class of other commercial and industrial taxpayers:

> The only simple way to prevent tax discrimination against the railroads is to tie their fate to the fate of a large and local group of taxpayers. A large group of local taxpayers will have the political and economic power to protect itself against an unfair distribution of the tax burden.

817 F.2d at 375. A smaller comparison class, *McNamara* worried, might be "too small and too foreign to fulfill this function." *Id.* In addition, the smaller class might "result in preferential treatment for the railroads," which Congress certainly did not intend. *Atchison*, 78 F.3d at 442; see also *CSX Transp.*, 131 S. Ct. at 1109 n.8; *id.* at 1119 (Thomas, J., dissenting). On the other hand, if "too broad a comparison class is chosen, the railroads will be placed at a competitive disadvantage that would defeat the purpose of the statute." *Lohman,* 193 F.3d at 986.

Perhaps this is just another illustration of Aristotle's golden mean, or more familiarly the story of the Three Bears. Either way, it seems to us that the appropriate comparison class for subsection (b)(4) does not lie at either extreme on the continuum of generality to particularity. It is the functional, middle group of all other com-

mercial and industrial taxpayers. This conclusion is supported by the need to read subsection (b)(4) "in light of the approach taken in the first three subsections" of the 4-R Act, which all directly or indirectly look to other commercial and industrial property. *Superior*, 932 F.2d at 1188; see also *Atchison*, 78 F.3d at 442; *Eagerton*, 541 F. Supp. at 1086 (relying on the "clear indication found in the body of § 1150[1](b) that commercial and industrial taxpayers are to be considered"). Thus, while many different types of *taxes* fall within the broad catch-all provision beyond those specified in subsections (b)(1)-(3), *CSX Transp.*, 131 S. Ct. at 1107, the risk of discrimination that Congress was addressing remains constant.

We do not regard this conclusion as incompatible with the Eighth Circuit's *Lohman* decision, which compared the railroads to their direct competitors but which also commented that "the comparison class should be appropriate to the type of tax and discrimination challenged in a particular case." 193 F.3d at 986. Given our preference for clarity, however, rather than an ill-defined "all the circumstances" type of test, we are content for now to endorse reference to other commercial and industrial users. If, as we contemplated in *Superior*, rail carriers in a later case so dominate the economy that the group of all commercial and industrial taxpayers would overlap almost entirely with that of railroads, it is possible that the statute would require a broader perspective. 932 F.2d at 1188. That is not our problem, however, and so we are content to leave that hypothetical for another day.

For the sake of completeness, we add a word or two to explain why we reject the "competitive" approach. In this case, there are *no* competitors of the railroads—"motor carriers, air carriers, barges, [or] Great Lakes ships"—that Sny Island is trying to tax. Compare *Minnesota Dep't of Rev.*, 507 F.3d at 695. The District's effort to gerrymander a competitive class by grouping the Railroads with pipelines and utilities is unpersuasive, largely because the individual members are not competitors in any meaningful sense of the term. Expanding the comparison class to include the 14 additional commercial and industrial taxpayers helps both by creating a pool large enough for meaningful analysis and by providing a group that includes (as the statute contemplated) taxpayers with local political representation (which is perhaps why those within city limits were exempt, and those outside of the city limits were "inadvertently" treated like the agricultural taxpayers).

2. *Discrimination.*

As with the phrase "another tax," the "statute does not define 'discriminates,' and so we look again to the ordinary meaning of the word." *CSX Transp.*, 131 S. Ct. at 1108. Discrimination, the Court has said, is the "'failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.'" *Id.* (quoting BLACK'S LAW DICTIONARY 534 (9th ed. 2009). *CSX Transportation* did not shed much additional light on what constitutes discrimination in the present context. In *dicta*, however, the Court observed

that "[w]hether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers." *Id.* at 1109 n.8. In *ACF Industries*, the Court suggested another way to show discrimination under the 4-R Act's catch-all: discrimination might occur in a "case in which the railroads—either alone or as part of some isolated and target group—are the only commercial entities" subject to a tax. 510 U.S. at 346. In such a case, "one could say that the State had singled out railroad property for discriminatory treatment." *Id.* at 346-47.

Those were the basic facts in *Superior*, which *ACF Industries* cited in support of this form of discrimination for purposes of subsection (b)(4). See *id.* at 436. There, Wisconsin passed a per-ton tax to be applied at iron ore docks. The tax, although framed broadly, applied only to a rail carrier, because it was the sole operator of the three iron ore docks in the state. *Superior*, 932 F.2d at 1186. Because the state was "levying a tax on an activity in which . . . only railroads engage," the tax could not stand. *Id.* at 1188. It is now well established that a showing that the railroads have been targeted is enough to prove discrimination; indeed, this may be the only way to show discrimination for an *ad valorem* property tax exemption, which normally falls under subsection(b)(3). See *Alabama Dep't of Rev.*, 550 F.3d at 1316 n.16 (collecting cases where taxes "target the railway industry"); *Burlington N. R.R. Co. v. Wisconsin Dep't of Rev.*, 59 F.3d 55, 57-58 & n.2 (7th Cir. 1995) (holding that an *ad valorem* exemption must "target" railroads). For taxes solely within the

ambit of subsection (b)(4), it remains to be considered whether anything other than deliberate targeting might amount to discrimination. In principle, the answer must be yes. *CSX Transportation* spoke of the state's being required to demonstrate a "sufficient justification" for disparate treatment, and it selected a definition of discrimination that implies "reasonable distinctions" between the favored and the disfavored. In our view, this confirms that discrimination can be shown even if there is no direct evidence of targeting.

A discriminatory tax is one that "imposes a proportionately heavier tax on railroading than other activities." *Superior*, 932 F.2d at 1187. The record shows that this happened here. The commissioners may have started off with a "reasonable distinction" in mind: improved land derives a greater benefit from flood prevention than unimproved land and, we will assume, may legitimately be taxed at a rate that reflects this benefit. But the District quickly went astray as it tried to apply this insight. In the end, it did not tax all industrial and commercial property equally. Instead, of the 14 taxpayers other than the Railroads in this class, the eight properties within municipal limits were charged no maintenance assessment whatsoever and the remaining six were treated the same as the agricultural landowners. The district court recognized that these facts support the inference that the District had an "intent to discriminate," and we agree.

Nevertheless, the district court found no impermissible discrimination, because it thought that "intent to discrimi-

nate is irrelevant under the 4-R Act." This statement is too broad. Instead, for subsection (b)(4), as with discrimination in other contexts, intent matters in determining whether a justification for disparate treatment is sufficient or is nothing but a pretext. The district court thought that its view of intent was supported by *Burlington N. R.R. Co. v. Bair*, 815 F. Supp. 1223, 1227 (S.D. Iowa 1993) (quoting *Burlington N. R.R. Co. v. Bair*, 766 F.2d 1222, 1226 (8th Cir. 1985)), but it was not. Although *Bair* said intent was irrelevant, this was for purposes of a tax challenged under subsection (b)(1) of the 4-R Act, not (b)(4). 766 F.2d at 1226. In contrast to (b)(4)'s broad language, (b)(1) prohibits a state or subdivision from assessing railroad property at a higher ratio of its true market value than the ratio of true market value assessed to other commercial and industrial property. 49 U.S.C. § 11501(b)(1). Only when the ratio of assessed value and true market value exceeds 5% that of commercial and industrial property can a rail carrier obtain relief. *Id.* § 11501(c). The precise standard thus outlined makes intent irrelevant. See *Bair*, 766 F.2d at 1226 ("Because there is no intent element in section 306, [the railroad] need only prove the accurate values, not purposeful undervaluation or overvaluation."). The catch-all provision of (b)(4), in contrast, encompasses any other kind of discrimination that may arise. See *CSX Transp.*, 131 S. Ct. at 1107-08; *ACF Indus.*, 510 U.S. at 343; *Union Carbide*, 69 F.3d at 1359. The intent to discriminate may be what signifies that a tax characterized nominally as one of general applicability is really one aimed at or designed to target the railroads.

The district court credited the commissioners' statement that their failure to assess the six commercial and industrial properties outside of municipal boundaries was "inadvertent," and the commissioners have promised to charge them on the new RPU method the next time around. This would still leave eight exempt commercial and industrial properties. That might be sufficient to show discrimination.

But that is not all that we have on this record. The discriminatory result is undisputed. The glaring evidence that this is exactly what the District meant to do appears in its methodology. The district court recognized that this "process" was questionable at best. Recall that the "assessment ratio," which looks similar to the type of equalization contemplated in subsection (b)(1), was created in a back-handed way. Rather than assess the actual value of agricultural property, Human made sweeping estimates based solely on a telephone call with the commissioners; he did this after the average increase for those properties had been capped at $10. Human's worksheets and assumptions of the benefit conferred by the levees might have been fair in theory (although they were sorely lacking in a solid empirical base), but they were discriminatory in practice. For the "decreased maintenance costs" Human assumed that damage might occur once every third flood for the pipelines, but he calculated the Railroads' maintenance costs in a way that resulted in a significantly greater value. There was no reason not to use consistent assumptions about flooding. The "increased physical efficiency" benefit, as we explained above, suffers from a similar

defect—the calculations were much more extensive, in a way that resulted in a greater assumed benefit (and thus corresponding cost) for the railroads than for the pipelines and utilities. Even worse, Human's proposed worksheets for the other six commercial and industrial properties do not even use "increased physical efficiency" as a metric for determining the benefit to tax.

We emphasize that we are not criticizing the District's theory that improved property should bear a greater proportional share of the tax burden. The problem, as we have already said, was in the implementation. If, as the commissioners maintain, the Drainage Code requires them to assess all property on a "benefit basis" then their entire scheme should reflect that, for agricultural and other commercial and industrial properties just as much as for RPU properties.

## IV

The last question we must address relates to the proper remedy. Subsection (c) of § 11501 provides an exemption to the Tax Injunction Act:

> Notwithstanding section 1341 of title 28 . . . a district court of the United States has jurisdiction . . . to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction.

49 U.S.C. § 11501(c). The district court reasoned, and Sny Island argues on appeal, that the second sentence of subsection (c) limits our ability to issue injunctive relief here because there is no evidence of the ratio between true market value and assessed value. The district court read the statute to require such a showing even if the underlying violation arose under subsection (b)(4) rather than any of the earlier provisions of subsection (b).

Since this case was before the district court, the Supreme Court has clarified that the second sentence of subsection (c) "concerns the relief available for violations" only of subsections (b)(1) and (2), not subsections (b)(3) or (4). *CSX Transp.*, 131 S. Ct. at 1105 n.2. It noted that an interpretation of subsection (c) that was limited to property taxes "cannot be right, because it would nullify subsection (b)(4) (and, for that matter, subsection (b)(3) as well)." *Id.* at 1108 n.7. Instead, the Court wrote, "subsection (c)'s remedial provision" should be understood "neither as limiting the broad grant of jurisdiction to federal courts to prevent violations of subsection (b) nor as otherwise restricting the scope of that subsection." *Id.* The remedial provision "simply limits the availability of relief" when a state or its subdivision "discriminates in assessing the value of railroad property, as proscribed by subsections (b)(1) and (b)(2)." *Id.*

Although an injunction is therefore possible, principles of comity require the federal court to act with restraint. For that reason, any injunction should "eliminate only [the] discriminatory effects rather than enjoining the entire rate or assessment scheme and requiring state

authorities to comply with federal law from scratch." *McNamara*, 817 F.2d at 378; see also *Clinchfield R.R. Co. v. Lynch*, 700 F.2d 126, 131 n.6 (4th Cir. 1983). The Railroads would like us to enjoin the District from collecting an assessment in excess of the $10-per-acre increase plus the 2008 assessment, but this is a step too far. On remand, the district court must enjoin the 2009 assessment, while at the same time leaving the District free to go back to the drawing board and craft an assessment that is non-discriminatory, as we have explained that concept.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.