WILSON, Circuit Judge:
The State of Alabama (State) imposes a 4% sales tax on the gross receipts of retail businesses, and a 4% use tax on the storage, use, or consumption of tangible personal property. See Ala.Code §§ 40-23-2(1), -61(a).[1] Appellant CSX Transportation, Inc. (CSX), an interstate rail carrier, pays the 4% sales tax whenever it purchases diesel fuel in the State. CSX’s main competitors in the State — interstate motor and water carriers — do not. In this appeal, we must decide whether exempting CSX’s main competitors from the State’s sales tax is discriminatory as to rail carriers in violation of the Railroad Revitalization and Regulation Reform Act of 1976 (4-R Act), 49 U.S.C. § 11501(b)(4). We conclude that the sales tax is indeed discriminatory and that the State has not offered a “sufficient justification” for exempting CSX’s competitors. See CSX Transp., Inc. v. Ala. Dep’t of Revenue (CSX II), — U.S. -, 131 S.Ct. 1101, 1109 n. 8, 179 L.Ed.2d 37 (2011) (‘Whether the railroad will prevail ... depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers.”). Accordingly, we reverse.
I. BACKGROUND
Rail carriers, motor carriers, and water carriers all compete for the shipment of freight in interstate commerce. Although all three purchase diesel fuel toward that end, the State taxes each competitor’s purchases differently: water carriers pay no tax whatsoever on their diesel fuel purchases, see Ala.Code § 40-23-4(a)(10); rail carriers pay the State’s 4% sales tax; and motor carriers pay an excise tax of 19$ per gallon, see Alabama Terminal Excise Tax Act (fuel excise tax), 2011 Ala. Act 565 (effective October 2012).[2]
The State distributes the revenue from the fuel excise tax as follows: for every gallon sold, 13$ goes to the Alabama Department of Transportation for the construction, repair, maintenance, and operation of public roads and bridges, and the payment of principal and interest on highway bonds; the remaining 6$ goes to cities and counties for the construction and *866 maintenance of roads and bridges, and to the Department of Transportation for general highway purposes. Revenue from the sales tax, on the other hand, goes toward a general revenue fund. See Ala.Code §§ 40-23-35, 40-23-85.
It is axiomatic that a state has broad discretion in the exercise of its taxing power. See Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973); Weissinger v. White, 733 F.2d 802, 805 (11th Cir.1984). That discretion will be reined in, however, where it offends a “specific federal right.” Lehnhausen, 410 U.S. at 359, 93 S.Ct. at 1003. At issue here are the federal rights Congress has afforded rail carriers pursuant to the 4-R Act. That Act provides that a state may not:
(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
(4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.
49 U.S.C. § 11501(b) (emphasis added).
Enacted to “restore the financial stability of the railway system of the United States,” the 4-R Act “target[s] state and local taxation schemes that discriminate against rail carriers.” CSX II, 131 S.Ct. at 1105 (internal quotation marks omitted). CSX contends that the State’s sales tax discriminates against it in violation of § 11501(b)(4) because CSX’s main competitors do not pay the sales tax when they purchase diesel fuel, giving them a competitive advantage over CSX.
CSX filed this lawsuit against Alabama’s Department of Revenue and its Commissioner in 2008. After the district court dismissed the complaint, we affirmed the dismissal based on our precedent in Norfolk Southern Railroad Co. v. Alabama Department of Revenue, 550 F.3d 1306, 1316 (11th Cir.2008), which established the rule that a railroad could not challenge its competitors’ exemptions from a sales tax as discriminatory under the 4-R Act. See CSX Transp., Inc. v. Ala. Dep’t of Revenue (CSX I), 350 Fed.Appx. 318, 319 (11th Cir.2009) (per curiam). CSX appealed, and the Supreme Court granted certiorari, overruled our decision in Norfolk, and held that “CSX may challenge Alabama’s sales and use taxes as tax[es] that discriminative] against rail carrier[s] under § 11501(b)(4).” CSX II, 131 S.Ct. at 1114 (alterations in original) (internal quotation marks omitted). The Court appeared to impliedly assume that the State’s exemptions for CSX’s competitors would be discriminatory unless “the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers.” Id. at 1109 n. 8.
After we remanded the case back to the district court, the court conducted a bench trial and issued an order holding that the State’s sales tax did not discriminate against CSX in violation of § 11501(b)(4). See CSX Transp. Inc. v. Ala. Dep’t of Revenue (CSX III), 892 F.Supp.2d 1300, 1317 (N.D.Ala.2012). The district court reasoned that because the State’s motor carriers paid a roughly equivalent amount *867 in taxes pursuant to the State’s fuel excise tax, the motor carriers’ exemption from the sales tax was not discriminatory. Id. at 1313 (finding that the “tax rate imposed per gallon of diesel fuel for rail carriers and motor carriers is essentially the same”). As to the water carriers, the district court held that CSX had offered “no evidence regarding the purported discriminatory effect as it relates to water carriers.” Id. at 1316. The district court dismissed the matter, and this appeal followed.
II. ANALYSIS
We review the district court’s application of the 4-R Act de novo, see Alphamed, Inc. v. B. Braun Med., Inc., 367 F.3d 1280, 1285 (11th Cir.2004), taking special heed of the guidance provided by the Supreme Court in CSX II. “ ‘Discrimination,’ ” the Court wrote, “ ‘is the failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.’ ” CSX II, 131 S.Ct. at 1108 (quoting Black’s Law Dictionary 534 (9th ed. 2009)). For example, “[t]o charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter.” Id. A tax exemption is analogous because the “State takes the favored group’s rate down to 0%.” Id. Therefore, CSX ITs holding suggests that a tax exemption disfavoring a rail carrier creates a rebuttable presumption of discrimination, unless the State can “offer[] a sufficient justification for declining to provide the exemption at issue to rail carriers.” Id. at 1110 n. 8.
A. Comparison Class
Before we address whether the exemption at issue is discriminatory, there remains a first-order question that the Court left untouched and has yet to be answered in this circuit: against what do we compare the railroads? The matter is one of scope, as any model of discrimination requires a fixed set of participants. If we compare CSX to all of the State’s taxpayers, it is no worse off because most taxpayers pay the sales tax when they purchase diesel fuel. On the other hand, if we compare CSX to motor and water carriers, questions of favorable treatment arise because they do not pay the sales tax. Among our sister circuits there are essentially two camps: the functional approach and the competitive approach.
We acknowledge that the question of the proper comparison class has not been the central inquiry of this appeal. In the proceedings below, the district court and the parties adopted the competitive approach, assuming that CSX must be compared with only motor and water carriers. Although we ultimately conclude that the competitive approach is appropriate in this circumstance, we are obliged to say a few words concerning the diversity of opinions on this matter.
Employing the functional approach, the Seventh and Ninth Circuits have compared the rail carriers to “other commercial and industrial” taxpayers based on § 11501(b)(4)’s three preceding subsections, which all contain the phrase “commercial and industrial.” See Kansas City S. Ry. Co. v. Koeller, 653 F.3d 496, 508 (7th Cir.), cert. denied, — U.S. -, 132 S.Ct. 855, 181 L.Ed.2d 551 (2011); Atchison, Topeka & Santa Fe Ry. Co. v. Arizona, 78 F.3d 438, 441 (9th Cir.1996). For example, in Koeller the Seventh Circuit considered whether an Illinois subdivision’s method of calculating taxes discriminated against railroads in violation of § 11501(b)(4). Seven hundred taxpayers comprised the tax base of the subdivision: eight of the 700 taxpayers were railroads, *868 pipelines, and utilities (RPU properties). Koeller, 653 F.3d at 500. Of the remaining 692 taxpayers, 14 conducted commercial and industrial operations, several were residents, and the vast majority used the land for agricultural purposes. Id. After severe floods and an increase in the price of diesel fuel sent the subdivision into a budgetary crisis, its commissioners increased the annual maintenance assessment — which for all intents and purposes was a “tax.” Id. Although the majority of the subdivision’s landowners saw modest hikes in their annual assessments, the RPU properties saw “astronomical increase[s].” Id. at 502. Norfolk Southern’s assessment, for instance, jumped a whopping 8,300% in one year, from $1,126 to $93,920. Id.
Before reaching the question of whether the tax was discriminatory, the Seventh Circuit acknowledged the different comparison-class options at its disposal. The court opted for the functional approach, in part because of “the need to read subsection (b)(4) in light of the approach taken in the first three subsections of the 4-R Act, which all directly or indirectly look to other commercial and industrial property.” Id. at 509 (internal quotation marks omitted). Yet the Seventh Circuit also recognized that “there are no competitors of the railroads — motor carriers, air carriers, barges, [or] Great Lakes ships — that [the subdivision] is trying to tax.” Id. (alteration in original) (emphasis in original) (internal quotation marks omitted). Therefore, opting for the competitive approach in Koeller would have yielded the bizarre result that a tax singularly raising a rail carrier’s tax rate by 4,800% was not discriminatory. With that in mind, the court compared the rail carriers with “the 14 additional commercial and industrial taxpayers” who did not suffer such a dramatic increase in their tax obligations, and held that the tax was discriminatory. Id. at 509-10.
Contrarily, the Eighth Circuit has endorsed the narrower “competitive approach” model, at least when considering a state’s sales tax. See Union Pac. R.R. Co. v. Minn. Dep’t of Revenue, 507 F.3d 693, 695 (8th Cir.2007); Burlington N., Santa Fe Ry. Co. v. Lohman, 193 F.3d 984, 986 (8th Cir.1999) (choosing the competitive model, but acknowledging that “the comparison class should be appropriate to the type of tax and discrimination challenged in a particular case” (emphasis added)). In Lohman, the Eighth Circuit addressed a scenario identical to the one before us: whether an exemption to Missouri’s sales tax caused the sales tax to violate § 11501(b)(4). See Lohman, 193 F.3d at 984. In that case too, motor carriers paid a fuel excise tax rather than a sales tax. Id. at 985. The court ultimately held that “the proper comparison class for Missouri sales and use taxes is the competitive mode.” Id. at 986. Paying homage to the 4-R Act’s broad purpose of restoring the railroads’ financial stability, the court emphasized that “[stability cannot be restored without making the railroads competitive.” Id. Furthermore, the court continued, if Congress “had wanted [§ 11501(b)(4)] to have the same comparison class as the property tax subsections, and none other, it would have written it that way.” Id.) see also Atchison, 78 F.3d at 445 (Nielsen, J., dissenting) (“If Congress wanted [§ 11501(b)(4)] to share the same broad comparison class as the three preceding subsections, and none other, it would have said so. It did not.”). This result made sense, the court reasoned, because a broad comparison class in that instance would have put the railroads “at a competitive disadvantage.” Lohman, 193 F.3d at 986.
*869 We have carefully studied the different approaches available to us, and we conclude that in light of the 4-R Act’s purpose of ensuring “financial stability” for rail carriers, the competitive model best serves that goal in the context of a state’s sales tax on diesel fuel.[3] Moreover, CSX and the State stipulated, and the district court agreed, that the proper comparison class for this case was CSX’s competitors.[4] Having determined that the appropriate comparison class is CSX’s competitors, we turn to the question of whether the sales tax is discriminatory.
B. Discrimination
As noted earlier, the Supreme Court held that tax exemptions can be discriminatory under the 4-R Act. CSX II, 131 S.Ct. at 1114. Given that we have opted for a competitive model in this case, and CSX’s competitors do not pay the State’s sales tax, we hold that CSX has established a prima facie case of discrimination. Quite simply, the sales tax overburdens the rail carriers because its competitors do not pay it. It therefore becomes the State’s burden to justify its discriminatory tax. See id. at 1110 n. 8.
The State devotes the majority of its brief to defending the motor carriers’ exemption to the sales tax on the ground that the motor carriers pay a roughly equivalent amount of taxes under the fuel excise tax. This argument misses the mark. Rather than framing the tax in question at its highest level of abstraction as “all the taxes paid on diesel-fuel purchases,” we agree with the Eighth Circuit that “we look only at the sales and use tax with respect to fuel to see if discrimination has occurred.” Union Pacific, 507 F.3d at 695 (internal quotation marks omitted). We are persuaded that even though in some years—depending on the price of diesel fuel—the State’s taxing arrangement might yield a fair result, “the actual fairness of those arrangements is too difficult and expensive to evaluate.” Lohman, 193 F.3d at 986 (quoting Trailer Train Co. v. State Tax Comm’n, 929 F.2d 1300, 1303 (8th Cir.1991)).
This construction of the 4-R Act finds support in the Act’s text. Section 11501(b)(4) prohibits the states from “im-pos[ing] another tax that discriminates against a rail carrier,” but the statute hardly “suggests that an individually dis *870 criminatory tax should be assessed for fairness against the entire tax structure of the state.” Kansas City S. Ry. v. McNamara, 817 F.2d 368, 377 (5th Cir.1987). If the 4-R Act required us to examine the tax regime for an entire commodity, it would have said so rather than speaking in the singular about “another tax.” Like the Eighth Circuit in Lohman, we find the Fifth Circuit’s well-reasoned opinion in McNamara to speak directly on this issue.
In McNamara, the Fifth Circuit struck down a Louisiana tax-imposed on transportation and communication utilities, which included rail carriers. Id. at 370. Using a commercial and industrial taxpayer comparison class, the Fifth Circuit held that the tax was discriminatory, and that Louisiana could not justify it based on the fact that other commercial and industrial taxpayers paid a roughly equivalent amount in sales and use taxes. Id. at 377. Refusing to consider the sales tax, the Fifth Circuit held that “[djetermining the intrinsic economic fairness of a tax system to a particular taxpayer is a paradigm of the kind of polycentric problem for which courts are ill-suited.” Id.
McNamara provided the rationale for the Eighth Circuit in Lohman and its progeny to hold that courts should not evaluate a state’s sales tax against other taxes in the state’s code. See Lohman, 193 F.3d at 986. Here, the district court below rejected the Eighth Circuit’s reliance on McNamara because McNamara employed the functional approach rather than the narrower competitive approach, and when the comparison class is thereby “drastically reduced” it does not “impose substantial theoretical and practical difficulties on a court.” CSX III, 892 F.Supp.2d at 1311. Because the comparison class has been narrowed, the dissent assures us, federal courts would not engage in “such a searching, time-consuming, expensive, and impracticable analysis.” Dissenting Op. at 874. We disagree.
Although the class of taxpayers might have been narrower had we opted for the functional approach, the “theoretical difficulties]” that concerned the McNamara court would remain. McNamara, 817 F.2d at 377. We would still be forced to decide whether a state’s fixed-percentage sales tax for one market participant is roughly equivalent to an ad valorem excise tax for another market participant. In addition, the authoritative value of that assessment would ebb and flow with every oscillation in diesel fuel’s market value— we would operate for some months, perhaps even years, under the fiction that the two taxes are equivalent.[5] Id. (“Furthermore, there is no reason in principle why the railroads could not sue for such a judicial assessment each year (or for each tax bill) because the dynamic nature of any state’s economy will alter the relative benefits and burdens of its tax system from moment to moment.” (emphasis in original)). And if the price of diesel fuel causes rail carriers to bear a significantly larger tax burden than its competitors, at what point must we reverse course and hold that the sales tax is discriminatory? After *871 one year of inequity? Three?[6] To adjust the comparison class makes little difference, and it behooves us to bear in mind the words of the Supreme Court:
[CJourts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. The complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes.
Minneapolis Star & Tribune Co. v. Minn. Comm’r of Revenue, 460 U.S. 575, 589-90, 108 S.Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (footnote omitted).
We therefore decline to undertake the Sisyphean burden of evaluating the fairness of the State’s overall tax structure in order to determine whether a single tax exemption causes a state’s sales tax to be discriminatory. This case, then, becomes much simpler than it would appear at first blush. Rail carriers pay the State’s sales tax — motor and water carriers do not. It is not a sufficient justification for the State to counter that its tax code will ultimately level the playing field.
Even if it were true that the exemptions at issue were not enacted to unfavorably target rail carriers, our decision would be the same because discrimination under § 11501(b)(4) “can be shown even if there is no direct evidence of targeting,” as long as the tax imposes a proportionately heavier burden on rail carriers. Koeller, 653 F.3d at 510. Here, the rail carriers’ main competitors have received favorable treatment: tax exemptions. In response, the State offers no “reasonable distinctions between the favored and the disfavored”; therefore it has failed to carry the burden set forth by the Supreme Court in CSX II. Id. In CSX II, the Supreme Court queried the State: “Can you justify why motor and water carriers are taxed differently than rail carriers?” The State responds: “Motor and water carriers are taxed differently because they are taxed differently.” But the Supreme Court demanded a justification from the State, not a Zen proverb. Section 11501(b)(4) does not allow us to sit idly by and take the State at its word that, in the long run, its tax code will burden CSX no more than its competitors. Moreover, no one can seriously dispute that the water carriers, who pay not a cent of tax on diesel fuel, are the beneficiaries of a discriminatory tax regime.
III. CONCLUSION
In short, after establishing a comparison class of competitors and showing that its competitors did not pay the sales tax on diesel fuel purchases, CSX made a prima facie showing of discrimination under § 11501(b)(4). The burden shifted to the State to provide a “sufficient justification” for the exemptions. It did not. We reverse the district court, hold that the State’s sales tax violates the 4-R Act, and remand to the district court with instructions to enter declaratory and injunctive relief in favor of CSX consistent with this opinion.
REVERSED AND REMANDED.

. For purposes of clarity, both taxes will be referred to as the "sales tax.”

. During the majority of this litigation, the State codified its fuel excise tax at section 40-17-2 of the Alabama Code. In October 2012, the State repealed that section and modified its motor fuel tax scheme. See Alabama Terminal Excise Tax Act, 2011 Ala. Act 565 (effective October 2012). The new statute changes the timing of the tax’s imposition, but the amount of the excise tax (19(t/gallon of diesel fuel) remains the same, and it still exempts motor carriers from paying the State’s sales tax on diesel-fuel purchases. For purposes of clarity, both taxes will be referred to as the "fuel excise tax.”

. We therefore decline to adopt Justices Thomas’s dissent in CSX II, which would have held that the appropriate comparison class in all 4-R Act discrimination cases is all commercial and industrial taxpayers. See CSX II, 131 S.Ct. at 1115 (Thomas, J., dissenting) ("I would hold that, to violate § 11501(b)(4), a tax exemption scheme must target or single out railroads by comparison to general commercial and industrial taxpayers.”). While this comparison class might be appropriate in certain situations, like Koeller, it fails to address discriminatory taxes that place rail carriers at a significant disadvantage vis-á-vis their competitors.

. Our approach creates tension with the Seventh Circuit's holding in Koeller only to the extent that Koeller established a bright-line rule for § 11501(b)(4) cases. See Koeller, 653 F.3d at 509 ("Given our preference for clarity, however, rather than an ill-defined 'all the circumstances’ type of test, we are content for now to endorse reference to other commercial and industrial users.”). While we recognize the virtues of bright-line rules, § 11501(b)(4) is a broad statute, designed to strike down all discriminatory taxes that place rail carriers at a competitive disadvantage—and Congress "specifically chose to omit any reference to a comparison class in subsection [(b)(4)].” Atchison, 78 F.3d at 445 (Nielsen, J., dissenting). Thus, while a malleable approach might not lend itself to the most efficient application, the language and purpose of § 11501(b)(4) require that "the comparison class should be appropriate to the type of tax and discrimination challenged in a particular case.” Lohman, 193 F.3d at 986.

. The dissent also points out that under today's holding, “the sales and use taxes would discriminate against a rail carrier even if its competitors paid four times as much tax as the rail carrier for the same commodity.” Dissenting Op. at 874-75. But if we were to adopt the dissent’s approach and accept the State's justification for its discriminatory tax — that motor carriers pay some other commodity tax, that is sometimes equivalent — the reverse would also be true. That is to say, the sales and use tax exemption would not discriminate against a rail carrier even if its competitors paid four times less in tax as the rail carrier for the same commodity.

. This is to say nothing of the added value that the motor carriers receive from being able to accurately forecast their year-to-year tax burden by virtue of being subject to a fixed excise tax rather than a variable ad valorem tax.